R.R. DONNELLEY & SONS COM-PANY, Appellant/Plaintiff,

v.

NORTH TEXAS STEEL COMPANY, INC., Appellee/Defendant.

No. 43A03–9911–CV–431.

Court of Appeals of Indiana.

July 18, 2001.

Rehearing Denied September 24, 2001.

Nelson Nettles, Peter A. Schroeder, Norris, Choplin & Schroeder LLP, Indianapolis, IN, Attorneys for Appellant.

Edward L. Murphy, Jr., Larry L. Barnard, Stephen J. Harants, Miller Carson

Boxberger & Murphy, Fort Wayne, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary/Issues

Appellant, R.R. Donnelley & Sons Co. (RRD) raises several issues on appeal. Because we find the trial court erred by allowing a non-party's consulting expert to testify against RRD, by excluding the rebuttal testimony of a RRD expert, by admitting a videotape prepared exclusively for mediation, and by failing to exempt RRD's experts from the separation order, and that collectively these errors prejudiced RRD at trial, we reverse and remand.

### Facts and Procedural History

This case involves the collapse of storage racks at RRD in Warsaw, Indiana. The storage racks were in RRD's warehouse and consisted of twelve rows of steel racks, each being 65 feet tall and 225 feet long.

RRD prints and assembles catalogs for retailers, including J.C. Penney, Land's End, Eddie Bauer, and Spiegel. RRD used the racks in question to store catalogs in the midst of processing. These catalog portions were stacked on pallets, bound with plastic, and stored on the racks for a short period of time until needed for binding.

The storage racks were fully installed at RRD's warehouse by March, 1994. On June 14, 1994, at 6:57 p.m., most of the storage racks collapsed. Since the collapse occurred at a shift change, no one was in the rack area. Just before the collapse, the racks were approximately fifty percent full, and the load was slowly increasing.

RRD purchased the storage racks, conveyors, and lift trucks for its warehouse from Associated Material Handling Industries, Inc. Associated purchased the storage racks from Frazier Industrial Company. Frazier designed the storage racks and contracted with the appellee, North Texas Steel Company, Inc. (NTS), to manufacture the component parts of the storage racks. Frazier gave NTS written instructions on how to manufacture these parts. NTS received raw steel from the steel mill, and then cut, punched, welded, and painted the steel. Frazier instructed NTS to ship the component parts of the storage racks from its Texas plant to RRD's plant in Warsaw, Indiana, where the racks were to be erected. Associated supervised the installation of the racks through a company named Coast to Coast.

After the collapse, RRD sued, originally filing the case against NTS, Associated, and Frazier for damages caused by the collapse of the storage rack. RRD claimed the collapse of the storage racks caused it to lose in excess of twelve million dollars. The complaint included products liability, breach of contract, and negligence claims against the defendants. Prior to trial, RRD resolved its differences with Associated and Frazier so that the trial concerned only the claims against NTS. Further, the trial court granted summary judgment for NTS on the breach of contract and negligence claims. Thus, only the products liability claim was at issue during the trial.

At trial, RRD contended that NTS defectively welded the component parts of the storage rack causing the rack system to collapse. NTS countered that the welds were sufficient to hold the load of the shelves, and therefore, did not cause the collapse. Instead, NTS claimed Frazier defectively designed the shelving system. The trial essentially amounted to a battle

of the experts as to the cause of the accident. The jury returned a judgment on this remaining product liability claim in favor of NTS. This appeal ensued.[1]

## Discussion and Decision

### I. Summary Judgment

NTS contends that the trial court erred in denying summary judgment on the products liability claim. RRD argues that the trial court erred in granting summary judgment on the negligence and the contract claims. We address each argument in turn.

▮▮▮ Our summary judgment standard of review is well settled. Upon review of the grant or denial of a motion for summary judgment, we apply the same legal standard as the trial court. *Clark v. CSX Transp., Inc.*, 737 N.E.2d 752, 757 (Ind.Ct.App.2000), *reh'g denied*. Summary judgment shall be granted if the designated evidence shows that there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law. *Id. See also* Ind. Trial Rule 56(C). Once the moving party has sustained its initial burden of showing the absence of a genuine issue and the appropriateness of judgment as a matter of law, the party opposing summary judgment must respond by designating specific facts showing a genuine issue for trial. *Id.* We will resolve any doubt as to fact or inference to be drawn from the evidence in favor of the party opposing the motion. *Id.* On appeal, the non-prevailing party has the burden to persuade the appellate tribunal that the trial court's decision was erroneous. *In re Estate of Von Wendesse*, 618 N.E.2d 1332, 1334 (Ind.Ct.App.1993), *trans. denied.* Our proper role includes

the careful scrutiny of the trial court's determination to assure that the non-prevailing party is not improperly prevented from having her day in court. *Id.*

### A. Products Liability Claim

The trial court denied NTS's Motion for Summary Judgment on the issue of products liability. At the same time, the trial court granted RRD's Cross–Motion for Summary Judgment on that issue, finding, as a matter of law, that NTS created a product sufficient to invoke the Indiana Products Liability Act (the Act)[2] by the cutting, punching, welding and painting of the steel provided by Frazier.

NTS contends that the trial court erred in not granting its Motion for Summary Judgment on the issue of products liability because the work performed by NTS for Frazier was predominantly the sale of a service and, therefore, not subject to the Indiana Products Liability Act. NTS alleges that it merely provided labor to perform the cutting, punching, welding, and painting requested by Frazier. In fact, NTS emphasizes that it billed Frazier based on the number of production hours required, and the purchase order reflected that NTS was billing for "labor costs." In further support of this theory, NTS points to the deposition testimony of a Frazier employee stating that when Frazier subcontracts its work, it is buying labor from the contract fabricators. Thus, NTS asserts that the facts of the case do not give rise to a claim under the Act and, therefore, that the trial court erred in not granting its Motion for Summary Judgment.

Conversely, RRD alleges that NTS is liable under the Act. RRD relies primarily on this court's decision in *Lenhardt Tool &*

---

1. Although RRD appeals all claims, NTS filed a cross-appeal with respect to the denial of summary judgment on the products liability claim.

2. Ind.Code § 34–20–1–1 *et seq.*

*Die Co. v. Lumpe*, 703 N.E.2d 1079 (Ind. Ct.App.1998), *trans. denied.* In *Lenhardt*, an explosion at a plant injured a worker while he was regulating the flow of molten metal into a mold, which Lenhardt Tool & Die (LTD) allegedly manufactured. The worker filed a complaint for negligence and strict liability against LTD. LTD moved for summary judgment on the strict liability claim, arguing that the transaction involved the sale of a service, not a product and, thus, that the Act was not applicable. The trial court denied LTD's motion.

In upholding the trial court's denial of LTD's Motion for Summary Judgment, this court announced that "[w]here an entity reconditions, alters, or modifies a product or raw material to the extent that a new product has been introduced into the stream of commerce, the entity is a manufacturer and provider of products under the Act." *Lenhardt*, 703 N.E.2d at 1085.

In *Lenhardt*, the plant would ship solid blocks of metal to LTD with drawings and specifications. LTD would then machine the block of metal into molds per the designs found in the drawings and specifications. Thus, we held that "[LTD] transformed the metal block into 'a new product' that is substantially different from the raw material used. Therefore it has introduced a new product into the stream of commerce and provided products to [the plant], not mere services." *Id.*

■ The *Lenhardt* case is instructive in the instant case. NTS clearly modified a raw material, steel, to produce the component parts of the RRD rack system. Specifically, NTS cut, punched, welded, and painted the steel. Thus, NTS transformed the steel into "a new product" that was substantially different from the raw material used. Therefore, NTS introduced a new product into the stream of commerce and provided products to RRD, not mere services. Following this court's analysis in

*Lenhardt*, NTS is a "manufacturer" and "provider" of products under the Act. Ind. Code § 34–6–2–77; *Lenhardt*, 703 N.E.2d at 1085. The trial court did not err in denying NTS's Motion for Summary Judgment on the issue of products liability.

## B. Contract Claim

RRD argues that the trial court erred by granting summary judgment on the contract claim because a genuine issue of material fact exists regarding whether the contract between Frazier and NTS contained terms making RRD a third party beneficiary. The contract between Frazier and NTS was not in writing: instead, they operated based on a standing relationship with understood terms.

■ Usually, only parties to a contract or those in privity with them have the right to recover under a contract. *Garco Indus. Equip. Co. v. Mallory*, 485 N.E.2d 652, 654 (Ind.Ct.App.1985), *trans. denied.* Those not a party to a contract may enforce the contract if they show that they are third party beneficiaries. *St. Paul Fire & Marine Ins. Co. v. Pearson Constr. Co.*, 547 N.E.2d 853, 856 (Ind.Ct. App.1989), *trans. denied.* A third party beneficiary contract exists when (1) the parties intend to benefit a third party; (2) the contract imposes a duty on one of the parties in favor of the third party; and (3) the performance of the terms of the contract render a direct benefit to the third party intended by the parties to the contract. *Id.* The intent of the parties to benefit the third party is the controlling factor and this may be shown by naming the third party or by other evidence. *Garco*, 485 N.E.2d at 654.

■ Corbin on Contracts concludes that most contracts between a principal building contractor and subcontractors:

are made to enable the principal contractor to perform; and their performance by the subcontractor does not in itself discharge the principal contractors' duty to the owner with whom he has contracted. The installation of plumbing fixtures or the construction of cement floors by a subcontractor is not a discharge of the principal contractor's duty to the owner to deliver a finished building containing those items; and if after their installation the undelivered building is destroyed by fire, the principal contractor must replace them for the owner, even though he must pay the subcontractor in full and has no right that the latter shall replace them. It seems, therefore, that the owner has no right against the subcontractor, in the absence of clear words to the contrary. The owner is neither a creditor beneficiary nor a donee beneficiary; the benefit that he receives from performance must be regarded as merely incidental. ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 779(D) (1951). Applying this reasoning here, due to the absence of language in the contract making NTS liable to RRD, RRD has no rights against NTS based on the contract. There is no evidence that NTS intended to assume liability to anyone other than Frazier. Therefore, RRD was not a third party beneficiary. Because RRD was not a third party beneficiary, the trial court did not err in granting summary judgment on the contract claim.

### C. Negligence Claim

Next, RRD contends that the trial court erred by granting summary judgment in favor of NTS on the negligence claim by finding that NTS owed no duty to RRD.

RRD argues that NTS owed a duty to RRD at the time of the collapse because Frazier never accepted NTS's defective work and the collapse of the racks could have potentially caused bodily injury to a third person.[3]

■■■ To prove its claim of negligence against NTS, RRD was required to prove that (1) NTS owed a duty of care to RRD at the time of the collapse; (2) NTS failed to conform its conduct to that standard of care; and (3) the breach proximately caused RRD's damages. *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind.1991). We first examine whether NTS as an independent contractor owed a duty of care to RRD at the time of the collapse.

■■■ Generally, an independent contractor has a duty to use ordinary care both in its work and in the course of performance of the work. *Computer Co. v. Davidson Industries, Inc.*, 623 N.E.2d 1075, 1076 (Ind.Ct.App.1993). However, once the owner of the property accepts the contractor's work, the contractor no longer has a duty of care to a third party. *Daugherty v. Herzog*, 145 Ind. 255, 44 N.E. 457, 458 (1896). This is so because the contractor has no privity of contract with the third party and the owner is presumably in a better position to prevent injuries to a third party once the work is accepted. However, an exception to the general rule was carved out where the work is so negligently defective as to be imminently dangerous to third persons, that is, to human life. *Holland Furnace Co. v. Nauracaj*, 105 Ind.App. 574, 14 N.E.2d 339, 342 (Ind.Ct.App.1938).

**3.** As noted in the preceding section, NTS was a manufacturer and provider of a product under the Indiana Products Liability Act. However, NTS argued its negligence claim in its brief and before the trial court as a sub- contractor and not as a manufacturer or provider of a product. Thus, we analyze this issue with negligence law as it pertains to subcontractors.

Therefore, in the instant case, NTS only owes RRD a duty of care if Frazier did not accept NTS's work or Frazier accepted NTS's work, but the work was so defective as to be imminently dangerous to third persons. We address each issue in turn.

 First, RRD contends that Frazier never accepted the welds performed by NTS because the defects were latent. Thus, RRD argues that NTS remains liable to RRD even though RRD may be a third party to the contract between NTS and Frazier. But, "if the defect in the work is or ought to be known, its acceptance will impose a duty to pay for it, and if no protest or complaint of the quality of the work is promptly made, will also discharge any right of damages for defects in performance." WILLISTON ON CONTRACTS § 724 (3d ed.1961). Here, Frazier's employee, Cesar Ortegon, worked as an inspector at the NTS plant while the component parts for the shelving were being manufactured. Ortegon, as inspector, should have known of any defect in the welds. Therefore, Frazier accepted the work of NTS because Frazier ought to have known of any defect in the welds.

 In the alternative, RRD contends that even if Frazier accepted NTS's work, NTS still owes it a duty of care because NTS's work was so negligent as to be imminently dangerous to third persons. To reiterate, a contractor may continue to be liable after acceptance where the work turned over by it is so negligently defective as to be imminently dangerous to third persons. *Holland* at 342. In particular, RRD alleges that although the collapse did not actually cause bodily injury during this incident, it would have likely caused serious injury had the collapse occurred at any other time than a shift change.

In order to address this issue, it is necessary to review the cases which recognize a third party's right to hold a contractor liable, after acceptance, where the work is so defective as to be dangerous. This right was first enunciated in *Holland.* In *Holland,* a landlord filed an action against Holland Furnace for negligently installing a furnace on her property. Holland Furnace had been hired by the landlord's tenant to install the furnace. Because the furnace was installed too closely to woodwork, the furnace caused the landlord's building to set on fire. Despite *no bodily injury* to anyone, we held Holland Furnace could be held liable to the landlord because "the furnace was installed in such a place and manner that the person or persons installing it would have anticipated that it might become dangerous to those who were to use it." *Holland,* 14 N.E.2d at 345.

Many years later, our supreme court approved of the *Holland* reasoning in *Citizens Gas & Coke Util. v. Am. Econ. Ins. Co.,* 486 N.E.2d 998, 1000 (Ind.1985). But, the court held it would not extend the abolition of privity where the negligence of the contractor created a risk of imminent danger of *property damage* only. *Id.* In *Citizens Gas,* the supreme court held that a contractor was not liable to a third party, where no privity existed, after the installation of a water heater created only an imminent danger to property. *Id.* In its ruling, the supreme court noted the requirement of privity had been abolished when there was "contractor liability involving personal injury caused by a product or work in a condition that was dangerously defective, inherently dangerous such that it created a risk of imminent personal injury." *Id.* The court acknowledged the reasoning behind this exception created by *Holland* and other cases to the general requirement of privity by stating that "[o]ne who sells a product or does construction work pursuant to a contract with

the owner of a building or premises which presents imminent danger to the health and safety of not only the party he contracts with but to other members of the public, can be held liable for resulting injuries even though the third party injured is not privy to the contract." *Id.* at 1000–01. The court recognized that this exception was based on humanitarian principles. *Id.* However, the court found no such humanitarian principle for the recovery of loss of property. *Id.* Although *there was no personal injury or risk of personal injury* in *Citizens Gas,* the court stated, "We see no reason to extend the exception to the privity rule any further in this case or others *not involving personal injury." Id.* at 1001 (emphasis added).

After *Citizens Gas,* our court squarely reached the issue of whether an exception to the privity rule exists in cases involving only a risk of personal injury. *Computer Co.,* 623 N.E.2d 1075. In *Computer Co.,* Davidson designed and manufactured roof trusses for a building occupied by Computer Company. After the roof of the building collapsed, Computer Company sued Davidson for property damages. *No one suffered bodily injury.* The trial court granted summary judgment for Davidson due to lack of privity and lack of personal injury. *Id.* at 1076. The Computer Company argued that lack of privity does not prevent it from recovery even though they only sustained property damages due to the roof collapse because the damage was caused by a product or work that created an imminent danger of personal injury. *Id.*

On appeal, we affirmed the grant of summary judgment. However, in the process of reaching this conclusion, we noted that Indiana law "appears to have once followed [the general rule that independent contractors are liable for negligent damage to property]." *Id.* at 1079. We

noted further that *"Holland Furnace,* which our supreme court cited with approval in *Citizens Gas & Coke* ... appears to support the Computer Company's claim. The *Holland Furnace* court allowed the owner of the building in question to recover for damage to her property without a showing of personal injury." *Id.* (citations omitted). Despite this observation, we affirmed the grant of summary judgment, noting our obligation to follow precedents established by our supreme court. Computer Company never sought transfer of the case to the supreme court.

After the *Computer Co.* case, our supreme court again in dicta, reiterated that personal injury is necessary to eliminate the requirement of privity between a contractor and a third party claimant. *Blake v. Calumet Const. Corp.,* 674 N.E.2d 167 (Ind.1996). Blake was an employee of a contractor working on a construction site. Blake sued another contractor, Calumet, for negligence. The supreme court reversed the trial court's grant of summary judgment finding, "[a] number of Court of Appeals cases have recognized an exception for work presenting an unreasonable *risk* of imminent injury to third parties." *Blake,* 674 N.E.2d at 172 (emphasis added). However, *despite the fact that Blake suffered bodily injury,* the court noted in dicta that *"Citizens Gas* expressly declined to find an exception to the requirement of privity between the contractor and claimant without personal injury." *Id.* at 173.

The supreme court has not yet recognized this exception where there is only a risk of bodily injury. Even though we share the same concerns as this court did in *Computer Co.,* we too are constrained to follow supreme court precedent. *Freeman v. State,* 516 N.E.2d 82, 83 (Ind.Ct.App. 1987). Accordingly, NTS did not owe a duty of care to RRD, and, thus, we need not address the other elements of RRD's

negligence claim. The trial court did not err in granting summary judgment on the negligence claim.

## II. Motion for Default Judgment

RRD filed a Motion for Default Judgment four days after NTS filed a Motion for Stay pending Interlocutory Appeal on the issue of personal jurisdiction. On the same day, the trial court entered an order and denied the Motion for Default Judgment and granted a Petition for Certification of Order for Interlocutory Appeal.[4]

The grant or denial of a default judgment is within the trial court's discretion. *Precision Erecting, Inc. v. Wokurka*, 638 N.E.2d 472, 473 (Ind.Ct. App.1994), *trans. denied*. On appeal, we will reverse only if the trial court's decision is clearly against the logic and effect of the facts and circumstances. *Id.*

RRD argues that the trial court erred in denying its motion for default judgment. RRD points to NTS's failure to timely file an answer to its original complaint as proper grounds for the entry of default judgment against NTS. When denying RRD's motion for default judgment, the trial court noted that "all matters related to timeliness in this case are the result of procedural disputes between the parties." Record at 219. RRD argues that the trial court erred because it found excusable neglect without first finding that NTS had defaulted. Excusable neglect allows relief from a default judgment under Indiana Trial Rule 60. Thus, RRD argues that it was improper for the trial court to address excusable neglect without first entering default judgment against NTS.

The trial court properly denied the motion for default judgment. The facts show that RRD's motion for default judgment was filed four days after NTS sought a stay of the trial court proceedings pending an interlocutory appeal on the issue of personal jurisdiction. The trial court denied the Motion for Default Judgment at the same time it certified the issue of personal jurisdiction for interlocutory appeal. Had NTS filed an answer, it could have been deemed a waiver of personal jurisdiction. Nothing was lost during the period the default judgment was not granted because the trial court did not have jurisdiction while the appeal was pending. After the appeal, the trial court held a Pretrial Conference and issued a scheduling order. The scheduling order set a time limit for NTS to file its answer. NTS met the court's timeline.

Further, Indiana Trial Rule 55 provides that, "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise comply with these rules and that fact is made to appear by affidavit or otherwise, the party *may* be defaulted." (emphasis added). Based on the permissive language of Trial Rule 55 and that we review the trial court's decision for an abuse of discretion, the trial court did not err, especially in light of the pendency of an interlocutory appeal on the issue of personal jurisdiction.

## III. Admission and Exclusion of Evidence

Generally, the admission or exclusion of evidence is a determination entrusted to the discretion of the trial court. *Zemco Mfg., Inc. v. Pecoraro*, 703 N.E.2d 1064, 1069 (Ind.Ct.App.1998), *trans. denied*. We will reverse a trial court's decision only for an abuse of discretion, that is, when the trial court's decision is clearly erroneous and against the logic and effect

---

4. *See North Texas Steel v. R.R. Donnelley & Sons Co.*, 679 N.E.2d 513 (Ind.Ct.App.1997) (affirming the trial court's determination that it had personal jurisdiction and the trial court's denial of NTS's motion for change of venue).

of the facts and circumstances before the court. *Id.* Erroneously excluded evidence requires reversal only if the error relates to a material matter or substantially affects the rights of the parties. *Id.* Further, any error in the admission of evidence is harmless if the same or similar evidence is submitted without objection. *Homehealth, Inc. v. N. Ind. Pub. Serv. Co.,* 600 N.E.2d 970, 974 (Ind.Ct.App.1992), *reh'g denied.*

### A. Admission of Evidence Prepared for Mediation

RRD contends that the trial court committed reversible error by admitting evidence prepared for mediation. In particular, RRD challenges the admission of a videotape into evidence because it was prepared "specifically for usage at the settlement negotiations" and the admission of Raymond Tide's opinions disclosed to "assist ... during settlement negotiations." Record at 1171, 1230. We address each argument in turn.

#### 1. The Frazier Videotape

Frazier videotaped shelf beam connection tests for use during mediation.[5] The video depicted a series of tests in which welds similar to the ones used in the RRD rack system were subjected to various amounts of weight in order to demonstrate their sufficiency. At one point in the video, some of the welds on an end connector were destroyed in an effort to show that even if some of the welds in a connection were bad, the rack would still be able to hold its load. Therefore, the video supported NTS's theory that even if the welds were not welded to Frazier's specifications, they could have withstood their load and, thus, were not the proximate cause of the rack collapse. Frazier presented the videotape to all parties during mediation. NTS offered the tape into evidence over RRD's contemporaneous objection at trial and prior objection in a motion in limine.

In particular, RRD alleges that the video should be excluded as a confidential settlement negotiation under Indiana Alternative Dispute Resolution Rule 2.12.[6] Conversely, NTS argues that the trial court did not err by admitting the videotape into evidence. NTS counters that it acquired the video outside of mediation and no restrictions were placed on its use and, therefore, contends the ADR rules do not apply.

We begin by noting that the video in question depicts two separate shelf beam connection tests. Frazier conducted the first test on September 1, 1995 in anticipation of the September 7 and 8, 1995 settlement negotiations. Additionally, the video depicts a second test that was conducted on October 13, 1995 for use at the second settlement conference on November 28 and 29, 1995. Both of these settlement meetings transpired prior to the filing of the lawsuit on December 18, 1995. Thus, absent an agreement providing otherwise, Indiana Alternative Dispute Resolution Rules (ADR) do not apply since these meetings took place prior to the filing of the lawsuit. Ind. ADR Rule 1.4 (mandating "[t]hese rules shall apply in all civil and domestic relations litigation *filed*

---

**5.** Exhibit E is the "Shelf Beam Connection Tests" videotape produced by Frazier and submitted to the other parties at the time of mediation. At trial, the original Frazier tape was edited and submitted as Exhibits Q (with audio) and Q–1 (without audio) by NTS. All three of these videotapes depict the same weld strength tests.

**6.** Although RRD relies on ADR Rule 2.11, Rule 2.12 was the operative rule at the time of the mediation. While the two rules are substantially similar, there are minor differences between the two rules. Thus, we rely on Rule 2.12 in our analysis.

in all Circuit, Superior, County, Municipal, and Probate Courts in the State.") (emphasis added). Generally, absent a showing that the parties agreed to be bound by the Indiana ADR rules prior to commencement of the lawsuit, we analyze the admission of evidence of conduct or statements made in compromise negotiations under Indiana Rule of Evidence 408. *See generally Vernon v. Acton*, 732 N.E.2d 805, 807–08 (Ind.2000). However, based on the arguments presented in the briefs it appears that the parties intended to be bound by the Indiana ADR rules during these pre-suit settlement negotiations.[7] Thus, we analyze this issue under the Indiana ADR Rule 2.12, in conjunction with Indiana Rule of Evidence 408.[8] Moreover, we note that we would reach the same result if we were to analyze the issue solely under Indiana Rule of Evidence 408.

■ At the time of the mediation in this case, the Indiana ADR Rules provided:

> Mediation shall be regarded as settlement negotiations. *Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in the course of mediation is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of the mediation process. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, or negating a contention of undue delay.* Mediation meetings shall be closed to all persons other than the parties of record, their legal representatives, and other invited persons. Mediators shall not be subject to process requiring the disclosure of any matter discussed during the mediation, but rather, such matter shall be considered confidential and privileged in nature. The confidentiality requirement may not be waived by the parties, and an objection to the obtaining of testimony or physical evidence from mediation may be made by any party or by the mediators.

A.D.R. 2.12, *now see* A.D.R. 2.11 (emphasis added).[9] In determining the admissibility of evidence under the confidentiality provision of our ADR rules, case law interpreting Federal Rule of Evidence 408 is instructive. Particularly relevant to this case is the Fifth Circuit Court of Appeal's decision in *Ramada Development Co. v. Rauch*, 644 F.2d 1097 (5th Cir.1981). Rauch attempted to admit into evidence a report originally produced in the course of settlement negotiations by one of Ramada's experts. Rauch claimed that he sought to introduce the report as part of his case in chief because it confirmed the majority of the alleged defects. The district court heard testimony regarding the origins of the report and concluded that it was inadmissible under Federal Rule of Evidence 408 because the report was a tool used in an unsuccessful settlement at-

---

7. Unfortunately, the record does not contain a copy of a pre-suit mediation agreement.

8. Rule 408 and ADR Rule 2.12 should be read together given the fact that ADR Rule 2.12 incorporates the language of Rule 408.

9. Indiana's ADR Confidentiality Rule at the time of this mediation incorporated the language of Federal Rule of Evidence 408. The language of Indiana's ADR Confidentiality provision has since been changed.

tempt. The Fifth Circuit Court of Appeals agreed with the district court relying on the policy reasons behind the enactment of Federal Rule of Evidence 408. *Ramada,* 644 F.2d at 1107. Specifically, the *Ramada* court stated:

> The present rule [408] fosters free discussion in connection with such negotiations and eliminates the need to determine whether the statement if not expressly qualified "falls within or without the protected area of compromise;" *the question under the rule is "whether the statements or conduct were intended to be part of the negotiations toward compromise."* ... The rule does not indicate that there must be a pre-trial understanding or agreement between the parties regarding the nature of the report.

*Id.* at 1106–07 (citations omitted) (emphasis added). The court continued by stating that

> [the architect who produced the report] was commissioned by Ramada to prepare a report that would function as a basis of settlement negotiations regarding the alleged defects in the motel. The report was to identify arguable defects that could be discussed in monetary terms in the negotiations. The ... report ... thus represents a collection of statements made in the course of an effort to compromise, and the district court properly held it inadmissible under rule 408.

*Id.* at 1107.

 Rauch attempted to argue that the report was admissible under the exception to Rule 408, which holds that the rule "does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." The Fifth Circuit concluded "clearly such an exception does not cover the present case where the document, or statement, would not have existed but for the negotiations, hence the negotiations are not being used as a device to thwart discovery by making existing documents unreachable." *Id.* Thus, whether the trial court erred in the instant case by admitting the videotape turns on whether the videotape was produced solely for mediation. We find that it was.

Mark Vespole, counsel for Frazier, submitted an affidavit stating that:

> 2. *In preparation for the first settlement conference* conducted in this case, I coordinated the testing and videotaping of a weld capacity test, conducted by my client, Frazier Industrial Company.
>
> 3. That test, and the videotaping of that test, were performed *specifically for usage at the settlement negotiations* that were conducted on September 7 and 8, 1995.

Record at 1171 (emphasis added). This affidavit suggests that Frazier produced the videotape solely for mediation. Further, Vespole, in a letter to the trial judge, stated:

> Frazier did not provide a videotape of its weld tests before the mediation.... Frazier's videotapes were prepared on September 1, 1995 in anticipation of the September 8 settlement meetings and on October 13, 1995 in anticipation of the November 28 and 29 mediation. In fact, the September 1, 1995 videotape of destructive weld testing was shown to all counsel and experts in attendance at the September 7 and 8 settlement conference and both the September 1 and October 13, 1995 videotapes were shown at the November 28 and 29 mediation.

Record at 657.

 All matters discussed in mediation are strictly confidential and privileged. *Marchal v. Craig,* 681 N.E.2d 1160, 1163 (Ind.Ct.App.1997); A.D.R. 2.12.

Moreover, and dispositive in the present case, the ADR rules expressly provide that the confidentiality requirement may not be waived by the parties and that an objection to the obtaining of testimony or physical evidence from mediation may be made by any party. *Id.* The ADR provisions are designed to protect the integrity of the mediation process itself and they are operational despite any attempt by the parties to override them. Confidentiality was a major concern among the parties to the mediation as evidenced by Vespole's letter and memorandum of law submitted to the trial judge. Specifically, Vespole stated:

> As the prospect for an initial settlement conference including experts, clients and insurance claim representatives in September, 1995 became more of a reality, concern regarding confidentiality starts to creep into the correspondence between and among counsel.... The enclosed correspondence referenced in the chronology of events makes it clear that expert ideas and research were being exchanged in the spirit of attempting to resolve the case through mediation and without litigation. It would obviously place a chilling effect upon mediation for cases of this magnitude for the participants to fear that, contrary to their stated understanding, opinions and research presented for the sole purpose of mediation would be subject to subsequent disclosure during a lawsuit which ensues.

Record at 660.

■■■■ At first blush, the confidentiality rule may seem harsh and appear to be an impediment to future litigation should it arise. However, when analyzing the admissibility of evidence of compromise negotiations, we must keep in mind that no "fruit of the poisonous tree" doctrine is intended. MILLER at § 408.101 (citing GRAHAM HANDBOOK § 408.1 at 280–81 (3d ed.1991)). In other words, a party cannot immunize from admissibility documents otherwise discoverable merely by offering them during compromise negotiations. *Id.* Accordingly, the factual matter disclosed in the course of compromise negotiations may be admissible at trial, although the evidence disclosing it would not. *Id.* Thus, NTS would have been able to present the information contained in the video to the jury, albeit in a form other than the Frazier video created "specifically for usage at the settlement negotiations." Record at 1171. NTS, however, did not and instead relied on the efforts of the other parties to the lawsuit in preparing its defense.

■■■■ While the rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations, this exception does not extend to the instant case where the videotape would not have existed but for the negotiations. Hence, the offering of the videotape during the settlement negotiations was not being used as a device to thwart discovery by making existing documents unreachable. Because we find that the videotape was prepared specifically for the settlement negotiations, and that to allow its use in any subsequent litigation would have a chilling effect on settlement discussions by subjecting opinions and research presented for the sole purpose of settlement negotiations to subsequent disclosure during any lawsuit that may ensue, we hold that the trial court erred by admitting such evidence over RRD's objections.

## 2. Raymond Tide's Testimony

RRD also argues that the trial court erred by admitting Raymond Tide's testimony at trial. Tide testified that the welds were not a primary cause of the rack collapse. He also contradicted the opinion of RRD's expert, Kenneth Wood, regarding cross-aisle impact theory. Associated

hired Raymond Tide as an expert in this case. However, Associated did not designate him as a witness for trial because Associated settled out of the case before filing a witness list.

Before Associated settled out of the case, it gave a copy of Tide's preliminary report to counsel for NTS, RRD, and Frazier. After the settlement, NTS sought to discover Tide's opinion. The trial court held a hearing and concluded that NTS had full discovery rights regarding Tide. RRD filed a motion in limine regarding Tide's testimony. At trial, RRD objected to NTS calling Tide as a witness. The trial court allowed Tide's testimony to be presented at trial.

In support of its motion in limine regarding Tide's testimony, RRD filed the affidavit of Thomas Belleperche, Associated's attorney. In the affidavit, Belleperche stated that Tide was hired as a consultant for the purpose of reviewing file materials, the collapse site and to discuss the merits or demerits of any claims RRD lodged against Associated. Additionally, Belleperche stated that Tide compiled a 'preliminary report' dated November 13, 1995. He distributed Tide's report to counsel for RRD, Frazier, and NTS before RRD filed the lawsuit. Tide's report contained his analysis and conclusions regarding the cause of the rack collapse. Furthermore, Tide accompanied Belleperche to the mediation in 1996. Belleperche stated that the "purpose of distributing Mr. Tide's preliminary report, together with having Mr. Tide available at the mediation ... was to assist me with respect to technical issues of the case, and also to assist me in presenting arguments on behalf of Associated ... during settlement negotiations." Record at 1230. Finally, Belleperche never prepared a witness list.

■■ Belleperche's affidavit suggests that Tide's preliminary report was compiled specifically for mediation. Tide's opinions were intended to be part of the negotiations toward settlement. This is similar to the situation in *Ramada*, 644 F.2d 1097, where the Fifth Circuit upheld the district court's exclusion of a report that represented a collection of statements made in the course of compromise efforts. Under *Ramada*, Tide's testimony which was based on the preliminary report he prepared for settlement negotiations should have been excluded.

In addition, the trial court violated Indiana Trial Rule 26(B)(4) by admitting Tide's testimony at trial.

T.R. 26(B)(4)(b) states:

A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only as provided in Rule 35(B) or upon a *showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means*.[10]

(emphasis added). RRD asserts that under this rule, Tide's testimony should not have been discoverable or admissible at trial because Tide was a consulting expert, not a testifying expert. As a consulting expert under Indiana Trial Rule 26(B)(4)(b), no discovery is permitted without "a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means."

■■ RRD asserts that the policy behind the rule encourages parties to consult

---

10. Indiana Trial Rule 35(B) concerns medical information and is not applicable to this case.

experts, discard experts should they choose to, and place those discarded experts beyond the reach of an opposing party. This is similar to *Reeves v. Boyd & Sons, Inc.*, 654 N.E.2d 864 (Ind.Ct.App. 1995), *trans. denied.* In *Reeves*, Boyd filed a witness list that included Allan McDonald, Ph.D. Reeves served a notice of deposition and subpoena duces tecum regarding McDonald. Later, Boyd removed McDonald from its witness list and moved to quash the deposition and subpoena. The trial court granted the motion. We affirmed the trial court's decision. In doing so, we noted that in "the case of an expert 'who is not expected to be called as a witness at trial,' a 'showing of exceptional circumstances' is required in order to go forward with discovery." *Id.* at 875. RRD argues that based on *Reeves*, the trial court erred in admitting Tide's testimony. We agree.

Indiana Trial Rule 26(B)(4) "was adopted in order to treat the expert witness outside of the work-product privilege, but within the specific context of a Rule and upon a basis of 'fairness.'" William F. Harvey, Indiana Practice: Rules of Procedure Annotated § 26.14 (3d ed.2000). In *Reeves*, we found that the purpose of Trial Rule 26 "was largely developed around the doctrine of unfairness-designed to prevent a party from building his own case by means of his opponent's financial resources, superior diligence and more aggressive preparation." *Reeves* at 875 (citations omitted). With this in mind, here, NTS would benefit from an adverse party's, Associated's, financial resources if allowed to use Tide's testimony. The same reasoning applies although Associated settled out of the case. Tide qualifies as an advisory witness under Trial Rule 26(B)(4)(b). He was retained by Associated in anticipation of litigation, but was never added to Associated's witness list

because Associated settled out of the suit before having to file such a list. In order for NTS to use Tide at trial, it would have needed to show exceptional circumstances. There is no such showing here.

Because Tide's preliminary report was used for settlement purposes and he was a consulting witness, the trial court erred in admitting his testimony.

## B. Exclusion of Expert Daniel Clapp's Testimony

RRD argues that the trial court erred in excluding the rebuttal testimony of Daniel Clapp. Clapp was designated by RRD as a rebuttal witness to NTS expert, Joseph Yura. In particular, Clapp was to rebut Yura's theory that the collapse was the result of a design defect, the lack of tower bracing/plan-X bracing, instead of bad welds. The trial court barred RRD from presenting rebuttal expert testimony from Clapp on two grounds: (1) RRD failed to timely disclose it would use Clapp for rebuttal testimony in addition to fact testimony; and (2) such rebuttal expert testimony would violate the trial court's summary jury trial orders limiting the parties to theories presented at the summary jury trial.

RRD attacks the trial court's decision to exclude Clapp as a rebuttal witness for several reasons. First, RRD claims that it timely disclosed the use of Clapp as a rebuttal witness. To support its claim, RRD notes that it designated Clapp as an expert witness on May 22, 1998. Thereafter, NTS deposed Clapp. Further, RRD asserts that it did not discover the opinions of Joseph Yura, an NTS expert, concerning the collapse of the racks until August 17, 1999. Moreover, it was not until the summary jury trial on August 24, 1999, that RRD learned that Yura would testify that the storage rack system was defectively designed due to its lack of tower bracing/plan-X bracing. RRD alleges that

it supplemented its expert interrogatory response identifying Daniel Clapp as a rebuttal witness to Yura's testimony on September 7, 1999. NTS then conducted a second deposition of Clapp.

Second, RRD asserts that it did not violate the trial court's summary jury trial order. RRD argues that using Clapp to rebut NTS's theory advanced for the first time at the summary jury trial was not presenting a new theory, contrary to the summary jury trial order, but rather, was simply a means of responding to the defense proffered by NTS. Further, RRD points out that it only became aware of NTS's theory at the summary jury trial; thus, it could not have formulated its rebuttal any earlier.

Third, RRD contends that exclusion of evidence as a discovery abuse sanction is proper only where there is a showing that the party engaged in deliberate or other reprehensible conduct which prevents the opposing party from receiving a fair trial. *F.E.H., Jr. v. State,* 715 N.E.2d 1272, 1274 (Ind.Ct.App.1999).

The standard of review in discovery matters is an abuse of discretion. *Old Indiana Ltd. Liability Co. v. Montano ex rel. Montano,* 732 N.E.2d 179, 183 (Ind. Ct.App.2000), *reh'g denied, trans. denied.* An abuse of discretion occurs when a trial court reaches a conclusion that is against logic and the natural inferences that can be drawn from the facts and circumstances before the trial court. *Id.*

While we recognize the great amount of discretion a trial judge has in ruling on discovery matters and the orderly conduct of the proceedings before him, we are troubled by the exclusion of Clapp's rebuttal testimony under the circumstances presented by this case. It appears that the trial judge based his decision to exclude the testimony due to an untimely disclosure. Because Clapp was proffering rebuttal testimony, and not a new theory, we are concerned by the trial judge's characterization of RRD's disclosure of the content of his testimony as untimely, especially in light of the fact that Indiana Trial Rule 26(E) only requires a duty to "seasonably" supplement discovery responses, rather than requiring immediate supplementation.

In the instant case, Clapp was not able to formulate his rebuttal testimony until he was fully aware of the content of Yura's testimony. Clapp first became aware of the substance of Yura's testimony at the summary jury trial. Within three weeks of discovering the substance of Yura's testimony, RRD identified Clapp as a rebuttal witness as to Yura's opinions. Further, NTS deposed Clapp after RRD identified Clapp as a rebuttal witness. Because we do not find deliberate or other reprehensible conduct on the part of RRD that prevented NTS from receiving a fair trial, we hold that the exclusion of Clapp's rebuttal testimony was too harsh a sanction. *Smith v. State,* 702 N.E.2d 668, 675 (Ind. 1998). Accordingly, we hold the trial court erred in excluding Clapp's rebuttal testimony.

## C. Exclusion of Experts from the Courtroom

RRD contends that the trial court erred by not exempting experts from its Separation Order. Before presentation of evidence began, counsel for NTS moved for a separation of witnesses. The trial court granted the motion and denied RRD's request to have experts in the courtroom in order to assist counsel.

We have previously determined that the purpose of a witness separation order is to prevent the testimony of one witness from influencing another. *Corley v. State,* 663 N.E.2d 175, 176 (Ind.

Ct.App.1996). Indiana Rule of Evidence 615(3) provides that a witness whose presence is shown to be essential to the presentation of the party's case cannot be excluded. This exemption most frequently is employed for expert witnesses, who are believed to be less susceptible to the temptation to shape their testimony. *Morvant v. Constr. Aggregates Corp.,* 570 F.2d 626, 629–30 (6th Cir.1978); 1 GRAHAM HANDBOOK § 615.1, at 916 (4th ed.1996). *See also Doe v. Shults–Lewis Child & Family Servs., Inc.,* 718 N.E.2d 738, 751 (Ind.1999) (noting because of the similarity between the Indiana Rules of Evidence and the Federal Rules of Evidence federal case law interpreting the Federal Rules of Evidence may be of some utility, particularly with regard to the rules governing expert evidence). The party seeking a witness's exemption under Indiana Rule of Evidence 615(3) bears the burden of proving that the witness's presence is essential. *Gov't of Virgin Islands v. Edinborough,* 625 F.2d 472, 476 (3d Cir.1980). Indiana Rule of Evidence 615(3) provides no automatic exemption for experts; a party must request it. However, whether a witness falls within the defined exemptions of Rule 615 is within the trial court's discretion. MILLER, INDIANA EVIDENCE § 615.103. *See also Fourthman v. State,* 658 N.E.2d 88, 90–91 (Ind.Ct.App.1995).

■ In the present case, we must determine whether the trial court erred in not finding RRD's experts to be essential witnesses under Indiana Rule of Evidence 615(3). Clause (3) exempts a witness whose presence is shown "to be essential to the presentation of the party's cause." Ind. R. Evid. 615(3); *Hernandez v. State,* 716 N.E.2d 948, 950 (Ind.1999), *reh'g denied.* The moving party, however, must show that the " 'witness has such specialized expertise or intimate knowledge of the facts of the case that a party's attorney could not effectively function without the presence and aid of the witness.' " *Hernandez,* 716 N.E.2d at 950 (quoting 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 615.04[3][b] (2d ed.1999)) (discussing the showing required for exemption under the identical federal version of Rule 615(3)) (citations omitted). Here, the trial court, after having read the briefs concerning the exemption of expert witnesses, ruled not to exempt RRD's experts from its Separation Order.

In its Trial Brief RRD asserted:

In this case, plaintiff requires the assistance of Daniel Clapp, the chief engineer for Frazier, to review the testimony of defendant's witnesses for accuracy, particularly defendant's experts, and be able to present rebuttal evidence. A major facet of defendant's defense is to try to place blame on the design instead of the manufacture of the storage racks. Daniel Clapp is by far the most knowledgeable person with regard to these matters who can assist plaintiff's counsel prepare rebuttal. In fact, Clapp was the drafter of the RMI standards that are at issue in this case. The nature of his rebuttal testimony is likely to be primarily opinion testimony in rebuttal of defendant's expert testimony. Under IRE 703, Clapp is permitted to base rebuttal testimony on the testimony from defendant witnesses.

Record at 1306–07. In response, the trial judge granted the Motion for Separation of Witnesses. As to exempting experts from the Separation Order, the judge ruled to not exempt experts from the Separation Order.

■ Given the complexities of this case, it appears that the use of experts was essential. Also, in order to rebut any theory proffered by the defense, it would be necessary for the plaintiff's experts either

to be present in the courtroom to witness the testimony or be provided with daily transcripts. However, RRD was denied such an opportunity. Thus, we find that the trial court abused its discretion by failing to exempt experts from the Separation Order, thereby hindering RRD's ability to respond to NTS's defense.

■ The cumulative effect of the admission of the videotape prepared specifically for mediation and of Tide's testimony, the exclusion of Clapp's testimony, and the failure to exempt expert witnesses from the Separation Order, requires reversal. Although the preceding errors are dispositive, we will give guidance on evidentiary issues likely to recur on remand.[11]

### D. Admission of Settlement with Associated and Frazier

RRD contends that the trial court erred by informing the jury of its settlement with Associated and Frazier. Before trial, RRD settled with Associated and Frazier and entered into an Agreement for Partial Assignment of Claims. Although the court decided that the settlement agreement itself was inadmissible, it instructed the jury that RRD had resolved its differences with Associated and Frazier.

RRD directs our attention to Indiana Rule of Evidence 408[12] and *Manns v. State Dep't of Highways*, 541 N.E.2d 929, 932 (Ind.1989), *superseded by statute on other grounds*, in support of its contention. In particular, RRD alleges that it was prejudiced by the trial court's preliminary and final instructions stating that RRD had resolved its differences with Associated and Frazier. Moreover, RRD claims that NTS compounded the prejudicial effect by making subsequent references about the resolution of claims with Associated and Frazier throughout the trial. However, RRD notes that while it objected to both the preliminary and final instructions, it did not object to the additional references made by defense counsel on that issue because it would only serve to further highlight the court's error.

RRD proffers two justifications for excluding evidence of the settlement of its claims with Associated and Frazier. First, RRD maintains that admission of such evidence or allowing such argument by counsel violates the spirit, if not the terms, of Indiana Rule of Evidence 408, especially where NTS offered no relevant purpose for its admission. Second, RRD claims that evidence of the agreement was seri-

---

11. We note that the appellant also raises the following issues: whether the trial court erred in admitting the testimony of expert, Joseph Yura, and whether the trial court erred in denying a directed verdict. Because we find that the trial court did not err in ruling on these issues and they are not likely to recur in any subsequent litigation of this matter, we need not address them. In addition, we do not reach RRD's contention that the trial court erred by excluding photographs of other storage racks designed by Frazier because this issue was waived due to RRD's failure to cite authority to support a cogent argument. *See* Ind. Appellate Rule 8.3(A); *Koo v. State*, 640 N.E.2d 95, 97 (Ind.Ct.App.1994), *reh'g denied, trans. denied.*

12. Rule 408 reads as follows:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering to accept a valuable consideration in compromising or attempting to compromise a claim, which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. Compromise negotiations encompass alternative dispute resolution.

ously and unfairly prejudicial to RRD because "when a jury is unnecessarily informed of a prior partial settlement, a plaintiff is likely to suffer unfair prejudice." *Manns*, 541 N.E.2d at 932.

■■■ Indiana Rule of Evidence 408 only prohibits evidence offered "to prove liability for or invalidity of the claim or its amount." Ind. R. Evid. 408. *See also* 12 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE § 408.101 (2d ed.1995). Evidence of compromise negotiations may be admissible for other limited purposes. Included among the permissible purposes for which evidence of settlement offers may be admissible is to provide an explanation of a potential party's absence from trial. *Id.* (citing *Belton v. Fibreboard Corp.*, 724 F.2d 500, 504–505 (5th Cir.1984)).

In *Belton*, the Fifth Circuit Court of Appeals held the settlement evidence was necessary for the purpose of explaining why the other defendants were not in the courtroom and that the trial court did not violate Indiana Rule of Evidence 408 by admitting evidence of settlement because the evidence was not offered to prove liability or the amount of damages but to explain why fifteen other defendants in a suit filed against sixteen parties were not in the courtroom. *Belton*, 724 F.2d at 505. Specifically, the Fifth Circuit examined the language of Indiana Rule of Evidence 408 and reasoned that by its terms the rule does not operate to exclude evidence unless it is offered "to prove liability for or invalidity of the claim or its amount." *Id.* (quoting Federal Rule of Evidence 408).[13] Moreover, the court explained that "whether to admit evidence for another

purpose is within the discretion of the trial court; the court's decision will not be reversed in the absence of an abuse of discretion amounting to 'manifest error.'" *Id.* (citing *Reichenbach v. Smith*, 528 F.2d 1072, 1074 (5th Cir.1976)).

■■■ Similarly, the evidence of settlement with Associated and Frazier in the instant case was not offered to prove liability in contravention of Indiana Rule of Evidence 408 but was offered to explain the absence of the other defendants. Thus, in light of the broad discretion given to the trial court in instructing the jury, and the exceptions to Indiana Rule of Evidence 408, we find that the trial court did not commit reversible error in instructing the jury about RRD resolving its differences with Associated and Frazier.

Moreover, RRD's reliance on *Manns* is misplaced. The instant action is distinguishable from *Manns* because unlike Manns where the amount and existence of a settlement reached the jury, the jury in this case was only told that the parties had resolved their differences. Further, there are other reasons for offering the settlement other than as evidence that RRD has already received compensation, for example, to explain why Associated and Frazier were not present at the trial. Therefore, *Manns* does not require us to find that the trial court abused its discretion in instructing the jury that RRD had resolved its differences with Associated and Frazier.

### E. Admission of a Demonstration to Clarify a Scientific Principle

Next, RRD asserts that a demonstration performed by Yura did not involve a model that was substantially similar to RRD's

---

**13.** Indiana Rule of Evidence 408 is strikingly similar to its federal counterpart. The two rules differ in only two respects. First, the Indiana Rule adds the sentence, "Compromise negotiations encompass alternative dispute resolution." Second, the Indiana Rule deletes the sentence, "This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." *See also supra* note 8 for the text of Rule 408.

rack system and did not demonstrate a scientific principle that existed in the instant case. RRD directs our attention to *Peterson v. State*, 514 N.E.2d 265 (Ind. 1987). In *Peterson*, our supreme court advised:

> The conduct of experiments and demonstrations in the courtroom can however pose peril to the fairness of a trial. In deciding whether to permit one, a court should consider such factors as the ability to make a faithful record of the drama for appeal purposes, the degree of accuracy in the recreation of the actual prior conditions, the complexity and duration of the procedures, other available means for proving the same facts, and the risk which the conduct of such a procedure may pose for the fairness of the trial.

*Id.* at 270. RRD maintains that the demonstration did not accurately recreate the actual conditions of the rack because the model used hinged, simple connections that are more flexible than the semi-rigid connections actually used in the RRD storage rack system.

Whether a demonstration should be allowed is within the sound discretion of the trial court. *Partlow v. State*, 453 N.E.2d 259, 271 (Ind.1993), *cert. denied.*

> "Demonstrative evidence, ... is by no means limited to items which may properly be classed as 'real' or 'original' evidence. It is today increasingly common to encounter the offer of tangible items which are not contended themselves to have played any part in the history of the case, but which are instead tendered for the purpose of rendering other evidence more comprehensible to the trier of fact.... If an article is offered for these purposes rather than as real or original evidence, its specific identity or source is generally of no significance

whatever. Instead, the theory justifying admission of these exhibits requires only that the item be sufficiently explanatory or illustrative of relevant testimony in the case to be of potential help to the trier of fact. Whether the admission of a particular exhibit will in fact be helpful, or will instead tend to confuse or mislead the trier, is a matter commonly viewed to be within the sound discretion of the trial court."

*SCM Corp. v. Letterer*, 448 N.E.2d 686, 692 (Ind.Ct.App.1983)(citing McCormick, Evidence § 212,528). In the instant case, the Yura demonstration was not intended to be a recreation of the RRD rack. Instead, the demonstration was intended to assist the jury in understanding the principle of lateral forces and the effect that cross-bracing can have on lateral forces. The trial judge took this purpose into consideration and ruled, "it doesn't have to be similar to the rack to be a display of a principle" and continued by advising counsel for RRD that, "[i]f you want to distinguish how what he's showing them is different from Donnelley, I think that's a super thing to do, but that's what the cross examination is for." Record at 3502. Due to the discretion afforded to the trial court in making evidentiary rulings and the fact that the demonstration was not intended to be a recreation of the actual collapse, but merely demonstrative of a complicated principle implicated by the facts of the case, the trial court did not err in allowing the demonstration.

### F. Admission of Caesar Ortegon's Testimony

RRD contends that the trial court erred in overruling its objection that the videotaped deposition of Caesar Ortegon, Frazier's inspector, was irrelevant. This deposition was offered to establish that Frazier supplied the welding machine and em-

ployed inspectors on site at the NTS plants.

 "In ruling on the relevancy of evidence, the trial court is accorded wide latitude to determine the probative value of evidence in contrast to its prejudicial impact." *Rogers*, 731 N.E.2d 36, 56 (quoting *Barnes v. Barnes*, 603 N.E.2d 1337, 1343 (Ind.1992)). "However, relevant evidence—that which logically tends to prove a material fact-is not inadmissible simply because of its prejudicial impact." *Id.* at 57. "It is only when the evidence is merely marginally relevant that the trial court has discretion to exclude it by balancing the probative value against the prejudicial impact." *Id.*

 Ortegon's testimony supported NTS's theory that the welds were sufficient to support their load. Because Ortegon's testimony was probative as to the major issue in the trial, whether defective welds were the proximate cause of RRD's damages, his testimony is particularly relevant. Considering the great amount of discretion vested in our courts when it comes to determining the admissibility of evidence and the fact that we find Ortegon's testimony to be extremely probative as to the issue at the heart of RRD's product liability claim, the trial court did not err by allowing Ortegon's testimony.

## IV. Jury Instruction on Proximate Cause

RRD argues that the trial court erred by instructing the jury on proximate cause. During trial, the following instructions were given to the jury:

*Jury Instruction 11*

As mentioned before, one of the elements Donnelley must prove is that damage was caused by defective welding of the storage racks. In proving damage was "caused by" defective welding of the storage racks, Donnelley need not prove the precise cause of the collapse, or even disprove every possible cause. Indiana law requires Donnelley to prove defective welding "proximately caused" the damage.

Although a person may manufacture a defective product, no liability attaches unless it appears that there was a proximate causal connection between the defective product and the damage caused. The manufacture of a defective product by the defendant as charged must have been a proximate cause of the damages.

"Proximate cause" is that cause which produces the property damage complained of and without which the result would not have occurred. That cause must lead in a natural and continuous sequence, uninterrupted by any efficient intervening cause, to the resulting property damage. A loss may have more than one proximate cause. Where two or more parties fail in the performance of some act, and the act would not have occurred unless both had failed, then both acts are a proximate cause of the damages and are referred to as concurrent acts. When the concurrent acts of two or more parties proximately cause the property damage, then the plaintiff may recover from any or all of those parties. A remote cause is one that is not a proximate and not a concurrent cause.

A remote cause is defined as conduct that merely creates a condition by which the subsequent injury producing acts of another are made possible. The existence of the first condition then is not the cause of the injury but is only a remote cause. In order to distinguish between a proximate cause and a remote cause, you may test the act with what the law refers to as the "but for" test. In other words, if the damage would not

have resulted but for the wrongful act of the defendant, then it is a proximate cause. On the other hand, if the defendant committed a wrongful act but the damage would have resulted even if the defendant had performed his act correctly, then his wrongful act is only a remote cause and not a proximate cause. Record at 1272.

### Jury Instruction 28

While the jury may consider the evidence and address the issues in such manner as it may choose, the Court offers this suggestion to organize the discussion of this matter.

First, were the welds defective? If you determine that they were not, then you should decide the case for the defendant and no further determination is necessary. If you determine that they were, then you should address the second issue.

Second, were the defective welds a cause of the rack collapse? If you determine that they were not, then you should decide the case for the defendant. If you determine that they were, then you should address the third issue.

Third, were the defective welds a proximate cause or a remote cause of the rack collapse, as those terms are defined in these instructions? If you determine that it was a remote cause, then you should decide the case for the defendant. If you decide that it was a proximate cause, then you should decide for the plaintiff and determine its damages as provided in these instructions. Record at 1288.

■■■■ When determining whether error resulted from the giving of an instruction, we use the following three prong test: (1) whether the tendered instruction correctly states the law; (2) whether there is evidence in the record to support giving the instruction; and (3) whether the substance of the instruction is covered by other instructions which are given. *King v. Clark*, 709 N.E.2d 1043, 1046 (Ind.Ct. App.1999), *trans. denied.* The decision to give a particular instruction rests within the trial court's sound discretion. *Id.* We review this decision only for an abuse of that discretion. *Id.* The giving of instructions will be reversed only if the instructions given, as a whole, failed to advise the jury of the applicable law or misled the jury. *Id.* We note that a trial court may be justified in giving an instruction if there is any evidence to support the instruction. *Id.* If there exists any facts or circumstances in the case although quite meager, to which the instructions might, upon any view, be pertinent, it would not be error to give them, although they were so given to the jury over the objection of the complaining party. *Id.*

RRD argues that the trial court erred in giving these instructions because they incorrectly state the law, they are not supported by the evidence, and they overemphasize issues adequately covered in other instructions. Specifically, RRD contends the instructions introduce the issue of intervening cause into the case. In addition, RRD contends that the instructions were not supported by the evidence because it was not possible that the alleged weld defects were a remote cause of the collapse. Finally, RRD argues that the trial court erred by including the "but for" test because it was inappropriate in a concurrent causation case.

■■■■ The trial court properly instructed the jury because first the instructions do not introduce the concept of intervening cause into the case. Second, there is evidence to support that the alleged weld defects were a remote cause of the collapse. Third, the trial court did not err by instructing the jury on proximate cause because the instructions correctly state the law and are supported by the evidence.

First, we note that although Instruction 11 mentions intervening cause, it does so only to clarify the meaning of proximate cause. The concept of intervening cause is not introduced independently. Therefore, there was no error in the jury instruction. In addition, it was not error to include an instruction on remote causes because there were two possible causes for the collapse: defective design or defective welds. It was possible that one of these was a remote cause of the rack collapse. Therefore, it was proper to include an instruction on remote cause.

Furthermore, the trial court's instruction on proximate cause was appropriate. The instruction introduced the "but for" test into the definition of proximate cause. Namely, the instruction told the jury that proximate cause existed only when the damage would not have resulted "but for" the wrongful act of the defendant. The "but for" test was relevant because proximate cause requires, at a minimum, that the harm would not have occurred but for the defendant's conduct. *See Gates v. Riley ex rel Riley*, 723 N.E.2d 946, 950 (Ind.Ct.App.2000), *trans. denied.* In addition, in *Ft. Wayne & Northern Indiana Traction Co. v. Parish*, 67 Ind. App. 597, 119 N.E. 488 (1918), we stated "where two causes concur in producing an injury, the party at fault for one of such causes will be held liable, if the injury would not have occurred in the absence of such fault." Based on this language it was not error to include the "but for" analysis. Thus, the trial court did not err in instructing the jury.

Reversed and remanded.

KIRSCH, J., and NAJAM, J., concur.