**FOUNDATIONS OF EAST CHICAGO, INC., Successor By Merger To East Chicago Community Development Foundation, Inc. and Twin City Education Foundation, Inc., Appellant–Plaintiff,**

v.

**CITY OF EAST CHICAGO, Appellee–Defendant,**

and

**State of Indiana, Appellee–Intervenor/Defendant.**

**No. 49A02–0711–CV–987.**

Court of Appeals of Indiana.

April 28, 2009.

Peter J. Rusthoven, Mark J. Crandley, Deborah Pollack–Milgate, Paul L. Jefferson, Barnes & Thornburg, LLP, Indianapolis, IN, Attorneys for Appellants.

Steve Carter, Attorney General of Indiana, Thomas M. Fisher, Solicitor General, Heather L. Hagan, Deputy Attorney General, Indianapolis, IN, Attorneys for State of Indiana.

James A. Knauer, William Bock, III, Steven E. Runyan, Kroger Gardis & Regas, LLP, Indianapolis, IN, Attorneys for City of East Chicago.

## OPINION

BAKER, Chief Judge.

The issues at the heart of this appeal have been winding their way through Indiana courts for years. In fact, our Supreme Court has granted transfer in another related case. In this appeal, the issue as presented by the appellant is the constitutionality of a statute. Inasmuch as we find that the constitutionality of the statute has no effect on the ultimate relief sought, however, we decline to answer the question.

Appellant-plaintiff Foundations of East Chicago, Inc. (Foundations), appeals the trial court's order entering final judgment in favor of appellee-defendant City of East Chicago (East Chicago). Foundations challenged legislation that permitted East Chicago to exercise its authority to select the recipients—including itself—of economic development funding provided by a riverboat casino. Finding that East Chicago has always had the authority to enact an ordinance to that effect—regardless of the legislature's enaction of the statute at issue—we affirm the trial court's order dismissing the complaint.

## FACTS[1]

In *City of East Chicago v. East Chicago Second Century, Inc.*, 878 N.E.2d 358, 365–68 (Ind.Ct.App.2007), ("*East Chicago I*"), *trans.granted*, we summarized the facts underlying the various legal disputes among these parties:

---

1. We held oral argument in this matter on September 17, 2008, in Indianapolis.

In 1994 and 1995, East Chicago and the Showboat Marina Partnership entered into two agreements providing for Showboat's distribution of some of its gaming revenue if it were awarded the license to operate the East Chicago riverboat casino. To secure a riverboat license, an applicant must show a commitment to local economic development, Ind.Code § 4–33–6–7(b),[2] so East Chicago negotiated with Showboat, the original licensee, that if East Chicago supported the Showboat application, Showboat would fund economic development with 3.75% of its future adjusted gross receipts. The agreement was dated April 8, 1994 and supplemented with a second agreement dated April 18, 1995. The agreements (hereinafter "the letter agreements") were subject to ratification by the East Chicago Common Council. The Council passed an ordinance in September 1995 endorsing the Showboat commitments.

Pursuant to the agreement Showboat would pay 1% to each of the Foundations, 1% to East Chicago, and .75% to Second Century. The Foundations are both not-for-profit entities.[3] Second Century is a for-profit corporation Showboat formed. Showboat was awarded the license in April 1997, and the Indiana Gaming Commission incorporated the terms of the letter agreements as conditions for Showboat's receipt of the license. Showboat made the payments accordingly. In 1999 the license was transferred to Harrah's, with Gaming Commission approval, and Harrah's continued to make the payments called for in the letter agreements.

In the fall of 2004, RIH Acquisitions, doing business as Resorts East Chicago ("Resorts"), applied to the Gaming Commission for transfer of the Harrah's license to Resorts. Resorts indicated it was willing to continue making the payments. The Gaming Commission granted the license transfer without addressing the letter agreements.

In 2004, our Supreme Court ordered a special mayoral election in East Chicago because of election fraud on the part of Mayor Robert Pastrick's supporters. George Pabey was elected mayor. In January 2005 the new city administration took office and the Common Council passed an ordinance that purported to redirect to East Chicago all the money that was being paid to Second Century and the Foundations pursuant to the letter agreements.

In April 2005, Second Century brought an action against Resorts, seeking a declaration that it was a third-party beneficiary of the agreement Resorts had with East Chicago, so if the license were transferred Second Century would continue to be paid .75% of the riverboat's adjusted gross revenues.

Resorts answered and brought a third-party complaint against the Foundations and East Chicago asking the court to declare to whom it has to pay the money for East Chicago economic development. In response East Chicago asked that the letter agreements be found void and unenforceable, and contended it should receive the entire 3.75%. The Foundations answered and asked the court to declare the letter agreements valid and to declare them entitled to their 1% each. The Foundations and Second Century moved to dis-

---

2. East Chicago relied on this statute in *East Chicago I,* but it was applicable only to the city of Gary.

3. Those Foundations merged and formed the entity that is the appellant in the case before us.

miss the East Chicago claims and East Chicago moved for summary judgment. The court granted a stay of discovery pending resolution of the motion to dismiss.

The Attorney General filed an amicus brief supporting East Chicago. The Attorney General determined there were financial irregularities in the internal operations of Second Century. It determined the letter agreements "may violate the integrity of the riverboat gambling industry," (App. at 2192), as they direct the economic benefit money to a private, for-profit corporation that has "resist[ed] any public oversight," (*id.*), and the principals of Second Century and the previous East Chicago administration may have made material omissions and/or misrepresentations to the Indiana Gaming Commission in obtaining and maintaining the agreement made. It also determined the letter agreements may be "inconsistent with the stated purpose of the Act to assist economic development" as East Chicago may not have received economic development from Second Century "commensurate" with the amount of money Second Century received under the letter agreements. (*Id.*) The Attorney General suggested the letter agreements may be void as against public policy.

After the Attorney General's findings, and about a year after Second Century brought its declaratory judgment action, the Gaming Commission issued a resolution disapproving continued payments by Resorts to Second Century. Many of the irregularities alleged in the Gaming Commission's resolution mirror the issues raised in the civil contract action. In addition, East Chicago argues in the civil action, as the Attorney General suggested in the Commission proceeding, the letter agreements are void as against public policy. Due to these similarities, the Foundations moved to consolidate the contract action with the appeal of the Gaming Commission's administrative decision.

After consolidating the actions, the trial court denied East Chicago's motion for summary judgment and found the letter agreements created an enforceable contract.

(Original footnotes omitted.) We affirmed in all respects pertinent to the case before us and our Supreme Court has since granted transfer.[4]

In 2007 the general assembly amended Indiana Code section 4–33–6–7[5] to provide as follows:

(c) This subsection applies to an owner's license issued for the City of East Chicago. If a controlling interest in the owner's license is transferred, the fiscal body of the City of East Chicago may adopt an ordinance voiding any term of the development agreement (as defined by IC 36–1–8–9.5) between:

(1) the city; and

(2) the person transferring the controlling interest in the owner's license;

that is in effect as of the date the controlling interest is transferred. The ordinance may provide for any payments made under the redevelopment agree-

---

4. Our Supreme Court also granted transfer and has recently issued an opinion in another related case involving the same underlying facts. *Zoeller v. East Chicago Second Century, Inc.*, 904 N.E.2d 213 (Ind., 2009). The legal issues in *Zoeller* are largely distinct from those at issue herein, but to the extent they are relevant they are analyzed in Judge Brown's concurring opinion.

5. The amendment was Section 302 of the 2007 Budget Act. We will accordingly refer to the section at issue as "Section 302."

ment, including those held in escrow, to be redirected to the City of East Chicago for use as directed by ordinance of the city fiscal body. A requirement to redirect a payment is valid to the same extent as if the requirement had been part of the original agreement. If the ordinance provides for the voiding and renegotiation of any part of a redevelopment agreement, the mayor of the City of East Chicago may negotiate with the person acquiring a controlling interest in the owner's license to replace any terms voided by the ordinance. Terms negotiated under this subsection must be ratified in an ordinance adopted by the city legislative body.

Shortly thereafter, East Chicago passed an ordinance pursuant to the authority granted by Section 302 to redirect to itself all of the money that the casino had been paying to Foundations and its predecessors.

On May 3, 2007, Foundations filed a complaint challenging the validity of Section 302 under multiple provisions of the Indiana and United States Constitutions. The State eventually intervened to defend the statute's validity. Following a bench trial that took place on October 18, 2007, the trial court issued an order entering final judgment in favor of East Chicago, denying Foundations's requested relief of a permanent injunction. Among other things, the trial court's lengthy and comprehensive order provides as follows:

31. A history of corruption among governmental officials within East Chicago and the general Lake County area and particularly corruption in the [Mayor] Pastrick Administration which developed the scheme for funneling cash to [the recipients of the casino's economic development funds, including the predecessors of the Foundations] is well documented through various legal proceedings and investigations which were published in the press.

* * *

33. The public corruption scandals in the Pastrick Administration touched a number of officials prominent in the formation and direction of the Foundations.

* * *

39. ... On December 29, 2004, George Pabey took office as the newly elected mayor of East Chicago.

40. ... [T]here is substantial evidence that large sums of money transferred from the riverboat Licensee to the Foundations have not been put to use to benefit the citizens of East Chicago but have instead simply been permitted to pile up in the [Foundation's] bank accounts.

* * *

48. .... East Chicago public officials have no representation on the board of the [Foundations] which contends in this matter that it is entitled to over half of the City negotiated economic development funding from the riverboat licensee.

Appellant's App. p. 30–32 (internal citation omitted). The trial court concluded that Foundations did not have standing as a third-party beneficiary to challenge the City's actions. Notwithstanding that conclusion, the trial court went on to consider Foundations's arguments surrounding the constitutionality of Section 302, ultimately holding the statute to be constitutional. Foundations now appeals.

## DISCUSSION AND DECISION

The trial court entered findings of fact and conclusions of law. Therefore, we ap-

ply a two-tiered standard of review. *Freese v. Burns,* 771 N.E.2d 697, 700–01 (Ind.Ct.App.2002). First, we determine whether the evidence supports the findings, and then, we determine whether the findings support the conclusions. *Id.* We may reverse only if the evidence does not support the findings of the findings do not support the judgment. *Id.* During our review, we may not reweigh the evidence or reassess witness credibility, instead considering only the evidence favorable to the trial court's judgment. *Id.* We do not defer to the trial court on issues of law. *Id.*

Solely for the sake of argument, we will assume that Foundations has standing to pursue this litigation. We will also assume for argument's sake that Section 302 is unconstitutional on one of the bases offered on Foundations's laundry list of constitutional arguments.

Even if all of that is true, Foundations is not entitled to its requested relief. Notwithstanding *East Chicago I,* we can only conclude that the East Chicago Common Council has *always* retained the authority to modify the arrangement encapsulated in the letter agreements—regardless of Section 302.

As explained in *East Chicago I,*

... To secure a riverboat license, an applicant must show a commitment to local economic development, ... so East Chicago negotiated with Showboat, the original licensee, that if East Chicago supported the Showboat application, Showboat would fund economic development with 3.75% of its future adjusted gross receipts. The agreement was dated April 8, 1994 and supplemented with a second agreement dated April 18, 1995. The agreements (hereinafter "the letter agreements") were subject to ratification by the East Chicago Common Council. The Council passed an ordi-

nance in September 1995 endorsing the Showboat commitments.

... Showboat was awarded the license in April 1997, and the Indiana Gaming Commission incorporated the terms of the letter agreements as conditions for Showboat's receipt of the license.

878 N.E.2d at 366 (citation and footnote omitted). The *East Chicago I* court ultimately found the letter agreements to be valid, binding, and enforceable.

We must disagree with that result because we believe that enforcing these agreements would be a patent violation of public policy. As Judge Bailey aptly expressed in his concurring opinion, "the practical effect of that decision [that the letter agreements were not of indefinite duration and therefore terminable at will] binds the parties and their successors indefinitely." *Id.* at 384. To enforce this policy would be akin to permitting a corrupt public official to enter into an agreement that would bind his or her constituents in perpetuity; it would also bind a community to its current needs, notwithstanding the fact that it might need a park today and a hospital five years from now. To enforce such a policy would be profoundly unwise.

We hold, therefore, that the only way in which these letter agreements can be logically—and prudently—interpreted is to conclude that East Chicago has always retained the authority to change the recipient of the licensee's local economic development funds. In other words, the licensee is obligated to support the community at a certain level, but it is left to the East Chicago Common Council to determine the identity of the payee(s), and the Council has the authority to pass a new ordinance changing the identity of the payee(s) at any time. This is true regardless of the constitutionality of Section 302.

The judgment of the trial court is affirmed.

BROWN, J., concurs in result with opinion.

MAY, J., dissents with opinion.

BROWN, Judge, concurring in result.

I concur in the result reached by Judge Baker and note initially that it is the duty of this court to not enter upon the consideration of a constitutional question where the court can perceive another ground on which it may properly rest its decision. *City of New Haven v. Reichhart,* 748 N.E.2d 374, 378 (Ind.2001).

I do not believe Foundations to be a third party beneficiary of the letter agreements, but even assuming arguendo that it is, it cannot enforce the agreements.

A third party beneficiary contract exists when: (1) the parties intend to benefit a third party; (2) the contract imposes a duty on one of the parties in favor of the third party; and (3) the performance of the terms of the contract render a direct benefit to the third party intended by the parties to the contract. *R.R. Donnelley & Sons Co. v. North Texas Steel Co., Inc.,* 752 N.E.2d 112, 122 (Ind.Ct.App.2001), *reh'g denied, trans. denied.* The intent of the parties to benefit the third party is the controlling factor and this may be shown by naming the third party or by other evidence. *Id.* The intent of the contracting parties to bestow rights upon a third party must affirmatively appear from the language of the instrument when properly interpreted and construed. *OEC–Diasonics, Inc. v. Major,* 674 N.E.2d 1312, 1315 (Ind.1996). However, it is not necessary that the intent to benefit a third party be demonstrated any more clearly than the parties' intent regarding any other terms of the contract. *Id.* "Whether a third party will be viewed as 'intended' or 'inciden-tal' is necessarily a fact sensitive issue," and "[t]he line between protected and unprotected beneficiaries in a given situation may require a particularly careful analysis of the purposes, motives and intentions of the parties." 9 A. Corbin, Corbin on Contracts § 44.9 (2007).

Here, the letter agreements mention two nonprofit corporations, TCEF, and East Chicago Community Foundation, Inc. ("ECCF"). The letter agreements provide details for the creation of TCEF and ECCF and the constitution of their boards of trustees. Specifically, the letter agreements provide:

2. Showboat proposes that its Contribution be distributed as follows:

\* \* \* \* \* \*

b. One (1%) percent to the Twin City Education Foundation, Inc., ("TCEF"), an Indiana nonprofit corporation. TCEF will be independent of Showboat. Members of a seven member Board of Trustees of TCEF will be selected from or by the following entities or individuals:

Two representatives of two largest employers
Mayor
Common Council
Board of Trustees of the School City
Chamber of Commerce
East Chicago Education Foundation

In addition, at Showboat's option, Showboat shall be permitted to name an individual to the Board of Trustees of TCEF.

TCEF will focus on funding training programs that prepare workers for the 21st century. Training for riverboat-related jobs will not be funded by TCEF.

TCEF will administer as one of its programs a scholarship program (funded initially with a minimum of $50,000) for

post-secondary education for residents of East Chicago. Showboat agrees that at least $25,000 shall be set aside annually from this scholarship fund for the benefit of qualifying eighth graders entering high school. Such funds will be placed in individual interest bearing trust accounts for the benefit of such qualifying students and will be made available to them as college scholarships upon their graduation from high school and enrollment in institutions of higher education; provided that they have complied with the requirements of the scholarship program during their high school tenure.

Showboat further agrees that the balance of TCEF's funds will be dedicated to educational programs (both academic and vocational) in and around the City, with priority being given to programs in the City and for City residents.

c. One (1%) percent to the East Chicago Community Foundation, Inc. ("ECCF"), an Indiana nonprofit corporation. ECCF will be independent of Showboat. ECCF will receive, evaluate and select for funding proposals from individuals or entities within the City, and will fund community development projects within the City. A fifteen-to-twenty-one member Board of Trustees will be selected by or from the following individuals or entities:

Various Neighborhood Leaders

Mayor

Common Council

Chamber of Commerce

Board of Trustees of the School City

In addition, at Showboat's option, Showboat shall be permitted to name an individual to the Board of Trustees of ECCF. The majority of Board members will represent neighborhoods.

Appellant's Appendix at 1634–1635.

In contrast to the provisions of the letter agreements, the Articles of Incorporation for Foundations do not provide any requirements that certain entities be able to select the trustees. Specifically, the Articles of Incorporation for Foundations provide:

ARTICLE IX

Board of Directors

Section 9.01. *Number and Term of Office.* The Board of Directors shall consist of no more than nine (9) Directors. The term of office of a Director shall be as specified in the Bylaws; provided, however, that the term of an elected Director shall not exceed three (3) years. Directors may be elected for no more than three (3) successive terms. Terms of office of Directors may be staggered as specified in the Bylaws.

Section 9.02. *Qualifications.*

(a) *Qualifications.* Each member of the Board of Directors must meet the following qualifications upon election and thereafter in order to qualify to serve as a Director ("Individual Qualifications"):

  (i) **Residency:** Members of the Board of Directors shall be residents of the City of East Chicago at all times; *provided, however,* this qualification may be waived for a limited time in accordance with Section 9.02(b) below;

  (ii) **No Elected Official:** No member of the Board of Directors shall be an elected official at any time during service on the Board of Directors, and election to a public office shall automatically disqualify a person from serving or continuing to serve as a Director immediately upon certification of election with no further action being necessary

by the Corporation for the removal of the Director;

(iii) **Execution of a Confidentiality Agreement:** The business of the Board of Directors requires a Director to receive and evaluate confidential financial and other information. In order to qualify to serve and remain qualified to serve, each Director must execute certain confidentiality and disclosure policy statements and agreements in substantially the form required of and executed by all the Directors as approved by the Board of Directors; and

(iv) **Submission of Annual Conflict Report:** In order to qualify to serve and remain qualified to serve, each Director must verify and complete a Conflict of Interest form annually, in substantially the form required of and executed by all the Directors as approved by the Board of Directors.

(b) *Failure to Meet the Individual Qualifications During Entire Term.* Any Director who fails to meet the Individual Qualifications at any time during the Director's term as reasonably determined by the Chairman shall be deemed to have resigned from the Board of Directors automatically and without further action on the part of the non-qualifying Director or the Corporation, effective as of the time the Director fails to qualify, except that upon notice of a change in a current Director's qualifications, the Board of Directors may, by majority vote, waive the qualification of Residency (in Section 9.02(a)(i) above) for the remainder of the non-qualifying Director's then-current term. The other qualifications may not be waived.

(c) *Other.* Each Director shall have such additional qualifications as may be specified from time to time in the Bylaws of the Corporation as required by law.

Appellee's Addendum at 15–16.

Based upon the different qualifications set forth in the letter agreements and the Articles of Incorporation for Foundations and in light of the purposes, motives, and intentions of the parties, I conclude that East Chicago and Showboat did not intend to benefit an organization like Foundations by entering into the letter agreements.

The dissent references *East Chicago I.* However, the Court of Appeals in *East Chicago I* did not review whether Foundations had standing as a third party beneficiary. Rather, the court addressed whether East Chicago Community Development Foundation ("ECCDF") and the Twin City Education Foundation ("TCEF") were third party beneficiaries. *See East Chicago I,* 878 N.E.2d at 374–376. The conclusion in *East Chicago I* that ECCDF and TCEF were third party beneficiaries does not affect whether Foundations is a third party beneficiary because of the differences between Foundations and ECCDF and TCEF as expressed above.

Further, Judge Bradford's ruling in *East Chicago I* granting Foundations' motion to substitute itself for ECCDF and TCEF did not address the merits of whether Foundations has standing in this case. Rather, his ruling determined only that Foundations could be substituted for ECCDF and TCEF and not that Foundations had rights under the letter agreements. Thus, his ruling does not prevent this court from addressing whether Foundations is a third party beneficiary in this case.

Attempts to regard Foundations as a third party beneficiary also appear to be

contrary to the Supreme Court's opinion in *Zoeller v. East Chicago Second Century, Inc.*, 904 N.E.2d 213 (Ind.2009), in which the Supreme Court stated that the terms of the agreement between Showboat and East Chicago "were not intended to control the rights of any non-parties." Since a third party beneficiary contract exists only if (1) the parties intend to benefit a third party; (2) the contract imposes a duty on one of the parties in favor of the third party; and (3) the performance of the terms of the contract render a direct benefit to the third party intended by the parties to the contract, *R.R. Donnelley & Sons, supra*, 752 N.E.2d at 122, Foundations could not be a third party beneficiary.

Furthermore, even if Foundations was a third party beneficiary of the letter agreements, I would conclude that Foundations cannot enforce the letter agreements as they were of indefinite duration and therefore are terminable at will by either East Chicago or the license holder.

Most recently, Resorts was granted the license on the condition that Resorts would make the payments in question to TCEF and ECCF. No one had expected Showboat to have the license forever, and no one expected Showboat to make the payments forever. Circumstances change and everyone understood this when the license was granted to Showboat and Showboat agreed to make the payments. If Showboat had stopped making the payments, the conditions for receiving the license would not have been met and Showboat would have lost its license. East Chicago is not any more bound to the letter agreements than Resorts, the current license holder, and could have decided to terminate the license, which would have meant that Resorts would no longer have had to make the payments.

In January 2005, East Chicago decided to terminate the original letter agreements, as it had a legal right to do by setting forth new conditions to the continuation of the license. The new conditions were that Resorts would have to pay the same amount of money but to different entities. Apparently Resorts had no problem with these new conditions or the termination or modification of the original letter agreements, probably because the amount it had to pay did not change.

The Indiana Supreme Court addressed the letter agreements in a related case and held that the agreements constituted an express contract but that:

> the agreement is not like an ordinary commercial contract at all. This agreement was a mode of implementing the casino's obligation to contribute to local economic development. *Its terms were intended to control the rights and duties of East Chicago and the casino licensee in relation to each other; they were not intended to control the rights of any non-parties.*

*Zoeller v. East Chicago Second Century, Inc.*, 904 N.E.2d 213, 221 (Ind.2009) (emphasis supplied). Based upon *Zoeller*, I conclude that the agreements were enforceable and binding between East Chicago and Resorts for as long as the agreements lasted, but the agreements were still terminable by either party. *See Rogier v. American Testing and Eng'g Corp.*, 734 N.E.2d 606, 616 (Ind.Ct.App.2000), holding that "[a] contract providing for continuing performance and which has no termination date, or which provides that it will last indefinitely, is terminable at will by either party," and that "[s]uch a contract would thus be enforceable until terminated," *reh'g denied, trans. denied.*

As East Chicago had the right to terminate or modify the letter agreements, I

concur in the result of affirming the trial court.

MAY, Judge, dissenting.

For the reasons expressed in my opinion in *City of East Chicago v. East Chicago Second Century, Inc.*, 878 N.E.2d 358, 365–68 (Ind.Ct.App.2007), ("*East Chicago I*"), *reh'g denied, trans.granted*, I must respectfully dissent.