**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Apr 29 2014, 9:44 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JULIANNE L. FOX**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**DAVID A. GUERRETTAZ**
**MOLLY E. BRILES**
Ziemer, Stayman, Weitzel
& Shoulders, LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF LAURA HYATT, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 87A04-1309-DR-454 |
| | ) | |
| CHARLES HYATT, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE WARRICK CIRCUIT COURT
The Honorable David O. Kelley, Judge
Cause No. 87C01-1010-DR-721

**April 29, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BRADFORD, Judge**

## CASE SUMMARY

Appellant-Petitioner Laura Hyatt ("Mother") and Appellee-Respondent Charles Hyatt ("Father") were married in 1998, and two children, W.H. and S.H., were born of the marriage. W.H. has been diagnosed with an anxiety disorder and is undergoing treatment and counseling. In October of 2010, Father filed a dissolution petition and an emergency petition for provisional order on the same day. The next month, the trial court issued its provisional order granting Father parenting time pursuant to the Indiana Parenting Time Guidelines ("the Guidelines"). The provisional order allowed for the possibility that W.H. could refuse overnights with Father due to her anxiety.

On March 3, 2011, Mother and Father entered into an agreed dissolution decree ("the Decree"), which provided, *inter alia*, that they would share joint legal custody of W.H. and S.H., Father would have parenting time according to the Guidelines, and each parent was to have one-half of the summer. Despite the fact that the Decree did not allow for the possibility of W.H. refusing overnights with Father, W.H. never spent the night with Father. On August 23, 2012, Father filed a verified information for contempt. Mother responded by filing a motion for the appointment of a guardian ad litem ("GAL"), a petition for visitation modification, and a verified information for contempt. The trial court appointed a GAL soon thereafter.

After hearing evidence over the course of several hearings, the trial court issued its order regarding all pending matters. The trial court denied Mother's petition to modify and her information for contempt but found Father's information for contempt to have merit, sentenced Mother to thirty days of incarceration (subject to purge), and ordered her

2

to pay $750.00 to Father's attorney. Mother now appeals, contending that the trial court abused its discretion in denying her petition for visitation modification, erred in excluding evidence predating the Decree, and abused its discretion by finding her to be in contempt. We affirm.

## FACTS AND PROCEDURAL HISTORY

Father and Mother were married on July 17, 1998, and two children were born of the marriage: W.H., born on January 15, 2000, and S.H, born on January 27, 2006. During the marriage, W.H. was diagnosed with an anxiety disorder and prescribed Zoloft. On October 26, 2010, Father filed a petition to dissolve the marriage and requested a provisional order. On November 10, 2010, the trial court issued a provisional order governing, *inter alia*, custody and parenting time:

> The Mother shall have temporary custody of the children. The Father shall have parenting time according to [the Guidelines] every other weekend from 6:00PM on Friday until 6:00PM on Sunday and on Wednesday evenings from 6:00PM until 8:00PM. The Father shall pick the children up from the Mother on Friday the Mother shall pick the children up from the [F]ather on Sunday night. On Wednesday night, the Father shall pick up and return. The parties shall continue to engage in family counseling. [W.H.] shall continue her counseling and the Mother shall keep the Father informed of the counseling appointments. The Court recognizes that a problem may exist with [W.H.] and overnight visitations. Since this is only a temporary Order, if [W.H.] refuses to stay overnight, the Mother shall go to the Father's residence not later than 4:00PM on the Sunday she picks up [S.H.] and <u>shall</u> take [W.H.] with her, thus allowing the Father to spend at least two hours with [W.H.] in the Mother's presence. The weekend visitation shall commence November 12, 2010. Wednesday visitation shall commence November 17, 2010.

Appellee's App. p. 1.

3

Father also began attending counseling sessions with W.H. to work toward overnight parenting time. On March 3, 2011, the trial court entered the Decree, which also governed custody and visitation:

> The parties agree that the following custody, support and visitation settlement is in the best interest of the children and is accurately set forth below.
>
> 2.01 Legal and Physical Custody. That the parties shall share joint custody of their children. [Mother] shall be the primary residential custodian of the children of the parties with [Father] exercising parenting time per [the Guidelines] and at such other times as the parties agree. In addition, the parties shall have half (1/2) summer break; parties will alternate weekly physical custody.

Appellee's App. p. 5. By the time the Decree was issued, W.H. had already attended more than twelve counseling sessions with Dr. Vicky Lane, Ph.D., a licensed psychologist, in an attempt to address W.H.'s anxiety about spending the night at Father's home.

While the provisional decree was in effect, W.H. did not spend the night at Father's, and this continued after the Decree was issued. On August 23, 2012, Father filed an information for contempt. On September 14, 2012, Mother moved for the appointment of a GAL. On September 24, 2012, Mother filed a petition to modify the Decree and an information for contempt.

On November 20, 2012, GAL David Heal issued his report, which was supplemented on January 10, 16, and 17, 2013. On November 26, 2012, the trial court began a hearing on outstanding matters, which was continued on January 8, February 21, and April 25, 2013. Father testified that, instead of having parenting time with W.H. pursuant to the guidelines, Mother would pick W.H. up from his house on Friday night at

4

approximately 9:30 p.m., he would drive to Mother's on Saturday morning to retrieve W.H., and the process would repeat on Saturday night and Sunday morning. Father also testified that he was not getting parenting time in alternating weeks with W.H. during the summer, as he was supposed to.

Father testified regarding a voicemail message he had received from W.H. at approximately 12:30 a.m. on August 9, 2012, apparently the result of a "pocket," or unintentional call. On the voicemail, Mother and other members of Mother's family can be heard speaking with W.H., telling her, "don't say this, don't say that, don't throw your mom under the bus" and "to watch what she says[.]" Nov. 26, 2012, Tr. pp. 17, 20. GAL Heal also listened to the voicemail message and indicated that he heard Mother say, "Your dad lied to the judge, he has lied to everyone." Appellee's App. p. 27. GAL Heal also heard Mother say, "The reason you don't want to stay" but could not decipher more. Appellee's App. p. 27.

Father testified and produced other evidence indicating that Mother frequently communicated with S.H. and W.H. by telephone call or text message when they were with him. Additionally, on one occasion during the summer of 2012, Father planned to take S.H. on a weeklong trip to Florida. Father testified that when Mother came over to collect W.H. the night before he planned on leaving, S.H. also went outside to speak with Mother. When Father went out check on S.H. after approximately twenty minutes, Mother had her strapped into her seat and said, "I'm not letting her stay, she's not goin'." Nov. 26, 2012, Tr. p. 23. Mother left with S.H. and W.H., and Father called police for assistance in recovering S.H.

5

Dr. Lane testified that she began seeing W.H. in October of 2010 and that she had facilitated ten or eleven joint sessions with W.H. and Father. Dr. Lane indicated that Father had fully cooperated with W.H.'s treatment and all of her recommendations. Dr. Lane indicated that W.H. had spoken of her anxiety about spending the night at Father's "because she feels she will get too homesick and miss her mom[.]" Jan. 8, 2013, Tr. p. 38. Dr. Lane also acknowledged, however, that W.H. could be using her anxiety to get more attention and that Mother could be reinforcing W.H.'s anxiety, rather that reducing it, by acquiescing to every request to return to Mother's home from Father's. Specifically, Dr. Lane testified that "sometimes when kids have anxiety, uh, if … a lot of attention is paid to the anxiety then it tends to get worse." Jan, 8, 2013, Tr. p. 18. Dr. Lane added, "I don't think it would be helpful for Mom to just come pick up [W.H.] every time, uh, [W.H.] felt uncomfortable." Jan. 8, 2013, Tr. p. 18.

GAL Heal's reports indicated that Father's home was suitable for the children and that Father had told him that he did not appreciate Mother and her family discussing divorce issues in front of the children and that Mother was "always texting the girls during my time." Appellee's App. p. 19. The January 16, 2013, supplement recommended that "the court needs to admonish mother that she not talk in a negative fashion about father in front of the children" and found that "mother, aunt and grandmother are all openly hashing divorce issues in front of both [W.H.] and [S.H.]." Appellee's App. p. 28.

GAL Heal also testified that "[b]ased on [his] meetings with [W.H., he] didn't see any reason why she couldn't spend the night with [Father]" and "I think everything

6

should be transitioned into the regular Indiana Parenting Time Guidelines." Jan. 8, 2013, Tr. pp. 43, 45. GAL Heal also agreed with the proposition that the current parenting time situation did not allow for Father to have any uninterrupted time with the children free of interaction with Mother. Finally, GAL Heal indicated concern that it had taken almost three years to transition W.H. into overnight visitation with Father and that the issue with overnight visitation had been "going on since 2010 and we don't have a plan." Jan. 8, 2013, Tr. p. 50. GAL recommended that W.H. spend the night with Father once and report back to him as a first step.

On July 12, 2013, the trial court issued its order on all outstanding matters. The order reads, in part, as follows:

> After reviewing [the] evidence and the exhibits presented, the Court makes the following findings:
>
> 1.   The Father filed for Dissolution on October 26, 2010.
> 2.   The parties entered into [the Decree] on March 3, 2011.
> 3.   That Decree provided for the Father to have parenting time according [the Guidelines] and specifically provided that each parent was to have one half of the summer and alternate weekend physical custody. The Support Worksheet also gave the Father credit for 98 overnights.
> 4.   [W.H.] has not spent an overnight with the Father since the separation.
> 5.   [W.H.] began counseling with Vicky Lane around the time of the separation to deal with issues with Father and attended 17 sessions before [the Decree] was entered.
> 6.   The Mother goes to pick up [W.H.] from the Father's house so she will not have to spend the night.
> 7.   The Mother's telephone calls to both children during his parenting time [are] excessive.
>
> As a result of these findings, the Court enters the following Orders:

1.  The Mother's Petition to Modify is denied. There has been no change of circumstances to justify a modification. [W.H.]'s situation existed before [the Decree] and has not changed, but the Mother agreed in the [Decree] that the Father should have overnight visitation with [W.H.].

2.  The Mother's information is denied for lack of evidence that the Father engaged in any of the contemptuous conduct she alleged.

3.  The Father's information for Contempt is found to have merit. The Mother has engaged in intentional conduct that has deprived the Father of overnight visitation with [W.H.]. The Mother is found in contempt and sentenced to thirty days in the Warrick County Security Center. The Court will stay the execution of the sentence and allow her to purge herself of the contempt by insuring that [W.H.] spend overnights with the Father and limiting her telephone calls or text messages to only two per day not to exceed ten minutes each.

4.  The Mother is ordered to pay $750.00 to Father's attorney within thirty days of this order.

Appellant's Br. pp. 20-21.

Mother contends that the trial court abused its discretion in denying her visitation modification petition, erred in excluding evidence predating the Decree, and abused its discretion by finding her to be in contempt.

**DISCUSSION AND DECISION**

The Indiana Supreme Court has expressed a "preference for granting latitude and deference to our trial judges in family law matters." *In re Marriage of Richardson*, 622 N.E.2d 178, 178 (Ind. 1993). Appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge … did not properly understand the significance of the evidence, or that he should have found its preponderance or the inferences therefrom to be different from what he did." *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002) (citation omitted).

8

The trial court entered findings of fact and conclusions of law pursuant to Indiana Trial Rule 52. In such cases,

> we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. The trial court's findings and conclusions will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. We neither reweigh the evidence or assess the credibility of witnesses, but consider only the evidence most favorable to the judgment.

*Webb v. Webb*, 868 N.E.2d 589, 592 (Ind. Ct. App. 2007) (citations omitted).

## I. Whether the Trial Court Abused its Discretion in Denying Mother's Petition to Modify Visitation

Mother contends that the trial court applied the law incorrectly to the question of whether modification of visitation was warranted and abused its discretion in denying her request to do so. Indiana Code section 31-17-4-2 provides that:

> The court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child. However, the court shall not restrict a parent's parenting time rights unless the court finds that the parenting time might endanger the child's physical health or significantly impair the child's emotional development.

Mother notes that the trial court's findings addressed whether there had been a change in circumstances. Mother also notes that a trial court is required to consider whether there has been a substantial change in circumstances in a custody context, but not in a visitation context. *See* Ind. Code §§ 31-17-2-8; 31-17-2-21. Therefore, Mother argues, the trial court applied the law incorrectly in this case.

Even assuming that Mother is correct that the trial court incorrectly applied the law, we conclude that this alone does not warrant reversal. It is well-settled that "we

9

must affirm the trial court's judgment if it is sustainable on any theory or basis found in the record." *In re Marriage of Moser*, 469 N.E.2d 762, 766 (Ind. Ct. App. 1984). So, the question is whether the record contains sufficient evidence to sustain a finding that denying Mother's request would be in the best interests of the children.

First, we note that Mother specifically agreed in the Decree that Father was to have parenting time with W.H. according to the Guidelines and that such parenting time was in W.H.'s best interests. Moreover, "[t]he Indiana Parenting Time Guidelines are based on the premise that it is usually in a child's best interest to have frequent, meaningful and continuing contact with each parent [and] represent the *minimum time* a parent should have to maintain frequent, meaningful, and continuing contact with a child." Ind. Parenting Time Guidelines Preamble (emphasis added). Pursuant to Indiana Code section 31-17-4-2, the trial court cannot limit Father's parenting time unless Mother is able to establish that "the parenting time might endanger the child's physical health or significantly impair the child's emotional development." With this in mind, we conclude that the record contains sufficient evidence to support a conclusion that overnight parenting time with Father would not endanger W.H.'s physical health or impair her emotional development.

Dr. Lane testified that it was important for W.H. to spend time with Father, W.H. had been in therapy for over two years working toward overnights with Father, and Father had participated in joint therapy and had fully cooperated with Dr. Lane's recommendations. Dr. Lane testified, in essence, that W.H.'s anxiety would only get worse the longer W.H. waited to address it. Dr. Lane also agreed that part of the

10

treatment for anxiety is "confronting what is causing your anxiety[.]" Jan. 8, 2013, Tr. p. 30. Dr. Lane acknowledged that Mother could be reinforcing W.H.'s anxiety, rather that reducing it, by acquiescing to every request to return to Mother's home from Father's. (1/8 Tr. 31). Specifically, Dr. Lane testified that "sometimes when kids have anxiety, uh, if … a lot of attention is paid to the anxiety then it tends to get worse." Jan, 8, 2013, Tr. p. 18. Dr. Lane added, "I don't think it would be helpful for Mom to just come pick up [W.H.] every time, uh, [W.H.] felt uncomfortable." Jan. 8, 2013, Tr. p. 18.

Mother testified that W.H.'s relationship with Father had "improved … quite a bit" and that W.H. had never experienced a panic attack while with Father. Feb. 21, 2013, Tr. p. 25. Mother also testified that W.H. "seems to enjoy going with her father[,] adores her dad[, and] seems to look forward to [visitation with Father]" Feb. 21, 2013, Tr. p. 42. Finally, GAL Heal testified that "[b]ased on [his] meetings with [W.H., he] didn't see any reason why she couldn't spend the night with [Father]" and "I think everything should be transitioned into the regular Indiana Parenting Time Guidelines." Jan. 8, 2013, Tr. pp. 43, 45. GAL Heal also agreed with the proposition that the current parenting time situation did not allow for Father to have any uninterrupted time with the children free of interaction with Mother. (Jan. 8 Tr. 46).

On the whole, the evidence supports a conclusion that not only is having more regular visitation with Father not a threat to W.H., it is, in fact, in her best interest. In short, there is evidence that the best way to reduce W.H.'s anxiety regarding overnight visitation with Father is to confront that anxiety, and that further delay is only making that more difficult. Although Mother points to evidence that might tend to support a

11

conclusion that visitation modification would be in W.H.'s best interest, her argument is an invitation to reweigh the evidence, which we will not do. We conclude that the trial court did not abuse its discretion in denying Mother's request to modify visitation.

## II. Whether the Trial Court Abused its Discretion in
## Refusing to Admit Certain Evidence

Mother contends that the trial court abused its discretion in refusing to admit certain pieces of evidence.

> Generally, the admission or exclusion of evidence is a determination entrusted to the discretion of the trial court. *Zemco Mfg., Inc. v. Pecoraro*, 703 N.E.2d 1064, 1069 (Ind. Ct .App. 1998), *trans. denied*. We will reverse a trial court's decision only for an abuse of discretion, that is, when the trial court's decision is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Id*. Erroneously excluded evidence requires reversal only if the error relates to a material matter or substantially affects the rights of the parties. *Id*. Further, any error in the admission of evidence is harmless if the same or similar evidence is submitted without objection. *Homehealth, Inc. v. N. Ind. Pub. Serv. Co.*, 600 N.E.2d 970, 974 (Ind. Ct. App. 1992), *reh'g denied*.

*R.R. Donnelley & Sons Co. v. N. Texas Steel Co., Inc.*, 752 N.E.2d 112, 126-27 (Ind. Ct. App. 2001), *trans. denied*.

During the hearing, Mother sought to introduce into evidence as Mother's Exhibit A,[1] a document that purported to be a narrative concerning a 2003 traffic stop of Father; Mother's Exhibit D, which purported to be a series of text messages between Father and Mother; a letter, which was represented to be an agreement between Mother and Father as of January 26, 2011; and other evidence relating to events that occurred prior to the Decree. Mother's argument on this issue is that the trial court erroneously relied on

---

[1] There are two exhibits labelled "A" from the November 26, 2012, evidentiary hearing, the one admitted as "Respondent Exhibit A" and Mother's proffered "A."

Indiana Code subsection 31-17-2-21(c), which pertains to evidence heard in custody modification proceedings, to exclude the evidence. That subsection reads as follows: "The court shall not hear evidence on a matter occurring before the last custody proceeding between the parties unless the matter relates to a change in the factors relating to the best interests of the child as described by section 8 and, if applicable, section 8.5 of this chapter."

### A. Mother's Exhibit A

Mother's Exhibit A is a document purporting to relay the details of a July 11, 2003, traffic stop involving Father. Contrary to Mother's assertion, the trial court did not refuse to admit Mother's Exhibit A because it predated the Decree but, rather, because no witness authenticated it. Mother makes no argument on that basis and so has failed to establish an abuse of discretion.

### B. Mother's Exhibit D, the Letter, and Other Testimony

Exhibit D is a document purporting to be a series of text messages between Mother and Father, including a message sent by Father on January 25, 2011, which reads,

> No I have not been given overnights. Therefore, I would be giving something I don't have. There's no certainty I ever will. If [W.H.] wants to stay fine if not fine. These text messages hold that true. I haven't nor will I make anyone stay with me and that includes YOU!

The letter, for which a documentary offer of proof was not made, purported to memorialize a pre-Decree agreement between Mother and Father that he would not "force the issue of overnight parenting time[.]" Feb. 21, 2013, Tr. p. 20. As for the other

13

testimony, the trial court struck testimony from Mother regarding Father's temper and treatment of W.H.:

> Um, I believe that, um, I've-her father was, uh, emotionally abusive to her. Um, he-I've-he-he has a very bad temper that he doesn't seem to be able to control. I've seen him get mad and kick in doors. I've seen him get mad and throw things and put holes in walls. I've seen him yell at her. I've seen-I've heard him tell her she's worthless. I've heard him tell her that she was an embarrassment to him that-because of her weight, that she was fat and that no man would have her except another fat man.

February 21, 2013, Tr. p. 26.

As an initial matter, the record supports Mother's assertion that the trial court refused to admit Exhibit D, the letter, and her testimony regarding pre-Decree events on the basis that the evidence concerned pre-Decree events. The record also supports the contention that the trial court was under the impression that it was required to exclude the evidence pursuant to Indiana Code section 31-17-2-21(c). Mother argues that, because section 31-17-2-21(c) does not apply in a visitation modification proceeding, it was necessarily erroneous to exclude pre-Decree evidence. We cannot accept this argument: Even though the trial court was not required by statute to exclude the evidence on the basis that it concerned pre-Decree events, it does not follow that it abused its discretion in doing so.

Even though there is no statutory prohibition against the admission of pre-Decree evidence in a visitation modification proceeding, "[i]t is a well settled rule of law that the modification hearing cannot be used to retry the issues settled by the divorce decree." *Dufour v. Dufour*, 149 Ind. App. 404, 407, 273 N.E.2d 102, 104 (1971). The *Dufour* court elaborated on the rule:

14

Of course, the welfare of the children is the prime consideration, and should be so regarded in the hearing of the case, and the making of the decree. But when the case has been heard, and a final decree entered, the doctrine of res adjudicata applies as in any other case. There must be an end to such litigation. If, in this case, appellee has the right to go into the conduct of the appellant prior to the decree awarding the custody of the child he may do so in any number of subsequent proceedings for a modification of that decree, and thus the court may be called upon to re-try the issues already settled.

It is important to the child that there shall be an end to such litigation. No good can come to it from re-exposures of the faults of its parents. When the fitness of its custodian is once settled, that settlement should be regarded as final up to that time.

*Id.* at 408, 273 N.E.2d at 104-05 (citations and quotation marks omitted). It seems to us that the rule and its underlying justification have just as much force in the visitation context as they do in a custody context. Mother had the opportunity to present her pre-Decree evidence in the dissolution proceeding but did not. Under the circumstances, we cannot conclude that the trial court abused its discretion in excluding the evidence at issue.

### III. Whether Sufficient Evidence Supports the Trial Court's Finding that Mother Was in Contempt

Mother contends that there was insufficient evidence to sustain the trial court's finding that she was in contempt.

A party that is willfully disobedient to a court's order may be held in contempt of court. [*Witt v. Jay Petroleum, Inc.*, 964 N.E.2d 198, 202 (Ind. 2012).] It is soundly within the discretion of the trial court to determine whether a party is in contempt, and we review the judgment under an abuse of discretion standard. *Id.* We will reverse a trial court's finding of contempt only if there is no evidence or inference therefrom to support the finding. *Id.* Contempt of court involves disobedience which undermines the court's authority, justice, and dignity. *Id.* The trial court has the inherent power to maintain its dignity, secure obedience to its process and rules, rebuke interference with the conduct of business, and punish

unseemly behavior. *Id.* Crucial to the determination of contempt is the evaluation of a person's state of mind, that is, whether the alleged contemptuous conduct was done willfully. *Id.* "When a person fails to abide by a court's order, that person bears the burden of showing that the violation was not willful." *Meyer v. Wolvos*, 707 N.E.2d 1029, 1031 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*. The determination of whether to find a party in contempt permits the trial court to consider matters which may not, in fact cannot, be reflected in the written record. *Witt*, 964 N.E.2d at 202-203. The trial court possesses unique knowledge of the parties before it and is in the best position to determine how to maintain its "authority, justice, and dignity" and whether a party's disobedience of the order was done willfully. *Id.*

*Wilson v. State*, 988 N.E.2d 1211, 1218-19 (Ind. Ct. App. 2013).

We conclude that there is sufficient evidence to sustain the trial court's finding that Mother is in contempt. Essentially, Mother admits to intentionally disobeying the trial court's visitation order for over two years after the Decree was issued, a visitation order that, after all, she agreed to. Under the visitation scheme as it currently exists, Father's parenting time with S.H. and S.H.'s relationship with W.H. is also affected, as S.H. stays with Father on her designated overnights but not without the interruption of Mother coming each night to retrieve W.H. Moreover, during the much-reduced visitation that Father *does* enjoy with W.H., Mother frequently exchanges telephone calls and text messages with both S.H. and W.H., leading GAL Heal to opine that Mother's actions were preventing Father from having uninterrupted parenting time with either child.

Moreover, there is some evidence that Mother is reinforcing W.H.'s anxiety, speaking negatively about Father to W.H., and even coaching W.H. on how she might avoid overnight visitation. Dr. Lane testified that it was possible that Mother's

16

willingness to indulge W.H.'s anxiety might be exacerbating it. GAL Heal recommended to the trial court that it admonish Mother to stop speaking negatively about Father to the children. As for the potential coaching, Father testified regarding a voicemail message he had received from W.H. at approximately 12:30 a.m. on August 9, 2012, apparently the result of a "pocket," or unintentional, call. On the voicemail, Mother and other members of Mother's family can be heard speaking with W.H., telling her, "don't say this, don't say that, don't throw your mom under the bus" and "to watch what she says[.]" Nov. 26, 2012, Tr. pp. 17, 20. GAL Heal also listened to the voicemail message and indicated that he heard Mother say, "Your dad lied to the judge, he has lied to everyone." Appellee's App. p. 27. GAL Heal also heard Mother say, "The reason you don't want to stay" but could not decipher more. Appellee's App. p. 27. The last statement could be interpreted as a prelude to Mother suggesting a reason to W.H. that she might use as an excuse not stay overnight with Father.

In summary, for over two years Mother has failed to comply with the provisions of the Decree by seeking to alienate W.H. from Father through her comments and attempted coaching, excessive contact with W.H. while with Father, and interfering with the court-ordered overnight visitation. Moreover, the record demonstrates that Mother's animosity toward Father is playing a significant part in her disobedience. Finally, we note that the trial court has been in a position to evaluate Mother's demeanor throughout the litigation and during her testimony at the hearing. It would be a rare case indeed where we would ever second-guess a trial court's finding that a person has willfully disobeyed its orders. Pursuant to the trial court's inherent authority to secure obedience to its orders, we cannot

17

say that it abused its discretion in finding Mother to be in contempt, especially when the trial court granted Mother the ability to purge the contempt by ceasing her interference with Father's visitation with W.H.[2]

The judgment of the trial court is affirmed.

RILEY, J., and ROBB, J., concur.

---

[2] In her Brief of Appellant, Mother mentions the issue of whether her sentence for contempt was manifestly unjust but makes no separate argument to that effect. As such, we need not address it further.